Virgilio MALDONADO, Appellant,

v.

The STATE of Texas.

No. 72986.

Court of Criminal Appeals of Texas.

June 30, 1999.

Rehearing Denied Sept. 15, 1999.

Cruz Cervantes, Houston, for appellant.

S. Elaine Roch, Asst. Dist. Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

## *O P I N I O N*

MEYERS, J., delivered the opinion of the Court in which PRICE, HOLLAND, JOHNSON and KEASLER, J.J., joined.

Appellant was convicted in October 1997 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[1] Direct appeal to this Court is automatic.

1. Unless otherwise indicated all future references to articles refer to the Texas Code of Criminal Procedure.

Article 37.071 § 2(h). Appellant raises eleven points of error. We will affirm.

■ In his first point of error, appellant contends we must reverse his conviction because the verdict cannot be supported under the theory of law and fact submitted to the jury, citing *Malik v. State*, 953 S.W.2d 234, 238 n. 3 (Tex.Crim.App.1997) (noting line of cases holding that due process prevents appellate court from affirming conviction based upon legal and factual grounds not submitted to jury). Appellant was indicted for murder committed during the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2). He argues the offense of robbery requires proof of an attempted or completed theft. Yet, in appellant's recorded statement, which represented the only evidence connecting appellant to the crime, appellant did not admit to personally taking part in the theft of the victim's property. Appellant opines his recorded statement does not support a showing that he personally (as the primary actor) committed the underlying offense of robbery. Therefore, appellant argues, since the jury was not instructed on a parties theory of liability, he should not have been convicted of capital murder under the charge given.

This argument boils down to a challenge to the legal sufficiency of the evidence to support the underlying offense of robbery.[2] Thus, we will proceed with an analysis of the evidence under the *Jackson v. Virginia*[3] standard. Viewing the evidence in the light most favorable to the verdict, the trial testimony showed the following facts.

On Friday, November 11, 1995, after an evening playing volleyball, Augustin Saucedo dropped his father, Cruz Saucedo, off at his apartment. Augustin tried to contact his father that weekend, but received no response when he paged him (his father did not have a phone, only a pager). On the following Tuesday, when Augustin still had not heard from his father, he contacted his sisters, Paula and Hericelda, who lived in the same apartment complex as their father. Paula provided Augustin with a key to their father's apartment and accompanied him to the apartment. Augustin then discovered the decomposing body of his father lying on the kitchen floor.

Cruz Saucedo's hands had been bound with the electric cord of a Black & Decker iron and he had been shot twice in the head with a .45–caliber semi-automatic weapon. The police discovered four bricks of marijuana hidden in the apartment and recovered a pillow with two bullet holes soaked with "body fluids." Augustin noticed his father was not wearing a necklace he normally wore. Also, investigators found several cans of air freshener in the apartment, which Augustin had not noticed before his father's death. Investigators deduced the air freshener indicated someone stayed in the apartment for a period of time after the victim's death and sought to mask the stench of decay.

On April 24th of the following year, the police "received information" implicating appellant in this homicide. Officer Jaime

---

2. Appellant suggests this is a problem under *McCormick v. United States*, 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), and *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). Those cases are not implicated here, however, as they stand for the proposition that due process is violated when a conviction is affirmed on appeal on the basis of a legal or factual theory not passed upon by the jury at trial; in contrast, appellant argues the evidence is insufficient to support his conviction under the charge given (which did not include a parties charge). *See Fisher v. State*, 887

S.W.2d 49, 57 (Tex.Crim.App.1994)(discussing *McCormick*, *Dunn* and *Cole* line of cases).

3. In performing a legal sufficiency analysis, we review the evidence in the light most favorable to the verdict, and ask whether any rational trier of fact could have rendered the jury's findings beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Barnes v. State*, 876 S.W.2d 316, 321–322 (Tex.Crim.App.), *cert. denied*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).

Escalante went to the Harris County Jail to interview appellant who was incarcerated on unrelated charges. Escalante read appellant his *Miranda*[4] rights in Spanish. Appellant was talkative, but refused to discuss the instant offense. He asked Escalante to come back the next day and he would think about giving him a statement. Escalante returned the following day and, after he read appellant his constitutional rights again, appellant gave a tape recorded statement admitting his participation in this offense and others.

In the recorded statement, appellant admitted entering the victim's apartment with another man named Felix or Benito, while a third man, Adan, waited in the car. Appellant was carrying a .45–caliber pistol. They went to the apartment because Felix wanted to borrow a "cuerno" (AK–47). Appellant also asked the victim to loan them a pistol. When the victim refused to give them a "cuerno" or a pistol, Felix bound the victim with the cord of the iron in the kitchen. Appellant and Felix then demanded to know where the pistol was and also demanded to know the location of some marijuana they believed the victim had in his possession. The victim told them the marijuana was under the bed and the pistol was in the vacuum cleaner. Felix retrieved these items, then told appellant to kill the victim. Appellant remembered shooting the victim three times in the head, using a pillow to muffle the sound. Appellant noted that Felix was giving the orders and Felix took the marijuana out to the car.

Proof of a completed theft is not required to establish the underlying offense of robbery. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex.Crim.App.1996). At a minimum, to show attempted robbery, the State carried the burden of proving beyond a reasonable doubt that appellant had the specific intent to commit robbery and that appellant committed an act amounting to more than mere preparation for robbing the victim. *See* TEX. PENAL CODE ANN. § 15.01(a) (criminal attempt). Thus, if the State introduced evidence from which the jury could rationally conclude that appellant possessed the specific *intent* to obtain or maintain control of the victim's property either before or during the commission of the murder, it has proven that the murder occurred in the course of robbery. *See Williams v. State*, 937 S.W.2d 479, 483 (Tex.Crim.App.1996); *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App.1993), *cert. denied*, 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994); *Nelson v. State*, 848 S.W.2d 126, 132 (Tex.Crim.App.1992), *cert. denied*, 510 U.S. 830, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993). In resolving this question, the requisite intent may be inferred from circumstantial evidence and from the defendant's conduct. *Wolfe*, 917 S.W.2d at 275; *Robertson*, 871 S.W.2d at 705.

In the instant case, appellant's statement indicates he personally asked to borrow the victim's pistol and, after binding the victim, he and Felix both demanded that the victim tell them where the marijuana and the pistol were kept. Appellant claimed he and Felix had originally asked if the victim would loan them a "cuerno" or his pistol. It strains credulity to assert that appellant only sought to borrow a gun, especially after the victim refused to give it to them and Felix tied him up with an electrical cord. Moreover, the fact that appellant then immediately killed the victim rationally supports the conclusion that he personally intended at that time to steal the items he sought, rather than take them with the victim's consent. *See Williams*, 937 S.W.2d at 483.

In addition, while appellant did not admit to personally removing the *marijuana* from the victim's apartment, he did not explain who took the pistol from the apartment and did not even mention the victim's necklace, which was missing. The jury could have inferred that appellant himself took one or both of these items from the

---

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**244**

apartment. Further, appellant's statements that Felix ordered him to kill the victim and Felix took the marijuana were self-serving. A rational jury might not have believed them. In sum, appellant's statement, in combination with the other circumstantial evidence corroborating the statement, would allow a rational juror to conclude that appellant possessed the specific intent to obtain or maintain control of the victim's property before or during the commission of the murder. Thus, the evidence was sufficient to convict appellant as a primary actor. Appellant's first point of error is overruled.

■ Appellant's second through sixth points of error deal with the admissibility of his tape recorded statement and the transcription of that recording. In points two and three he argues the trial court erred in admitting the statement at the guilt/innocence and punishment phases of trial because "it was undisputed that the tape recording was not accurate." Appellant emphasizes that the transcript of the full recording shows "skips" in two places on the tape. Appellant avers these interruptions demonstrate that the tape recording lacked integrity and is not admissible under Article 38.22 § 3, and the similar predicate laid out in by this Court in *Edwards v. State*, 551 S.W.2d 731 (Tex.Crim. App.1977).

The State contends this Court, in *Angleton v. State*, 971 S.W.2d 65, 69 (Tex.Crim. App.1998), held that Rule of Evidence 901 has replaced *Edwards, supra,* as the method by which tape recordings are authenticated. Thus, the State asserts, it only needed to show that the recording was what its proponent claimed under the Rule 901 analysis set out in *Angleton.*

■ Article 38.22 § 3(a) governs admissibility of "oral or sign language statement[s] of an accused made as a result of custodial interrogation." The record shows that Officer Escalante interrogated

appellant while he was in custody in the Harris County Jail. Rule 901 (an evidentiary rule) cannot allow a proponent of evidence to bypass the requirements of Article 38.22 (a statute). *See generally* TEX. R.CRIM. EVID. 101(c).[5] In fact, Rule 901(b)(10) lists "Methods Provided by Statute or Rule" as an example of authentication/identification methods complying with Rule 901. Thus, we must now consider whether the recording was properly admitted under Article 38.22 § 3.

Appellant argues the "skips" or "anomalies" violate Article 38.22 § 3(a)(3), which reads:

(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless ...

(3) the recording device was capable of making an accurate recording, the operator was competent, and *the recording is accurate and has not been altered.*

(emphasis added).

At the suppression hearing and at trial, appellant presented the testimony of Dwight Cook, an expert on sound recordings. Cook described the two anomalies as "over-records." He said that the record button had been pressed and a total of four seconds had been recorded over the original tape (a three second interval and a one second interval). He could not say whether the over-records were done intentionally and could not say what had transpired on the original tape underneath the over-recorded portions. Cook noted that it was possible to stop the tape for an indefinite period, then place a short over-record over the tell-tale clicks on the tape. However, he heard nothing on this tape which would indicate that this trick had been performed. In fact, the flow of the conversation and the background noise on the tape was consistent before and after the over-records. Further, Cook found no

5. This rule is now codified as Texas Rule of Evidence 101(c), effective March 1, 1998.

The trial in this case occurred prior to that date.

evidence of any edits or other anomalies except these over-records and conceded the tape was otherwise apparently reliable. He also acknowledged that the over-records could have occurred accidentally as the tape was being copied.

Appellant took the stand at the suppression hearing. He asserted that Escalante had not informed him that he was being recorded. He said he never saw a tape recorder, although he saw something inside an envelope which could have been a small recording device. He insisted that Escalante had promised to talk to the prosecutor about helping him out in some way (a promise which does not appear on the tape). Appellant said he never saw Escalante stop a recorder.

Escalante testified at the suppression hearing that he informed appellant that he was recording their conversation and appellant consented to the recording. He remembered dropping the tape recorder at the beginning of the recording process and noted that the metal table top may have caused strange noises on the tape, but he could not explain the anomalies. He remembered that at least three people had taken the tape to listen to it or make copies and he admitted he had not removed the plastic tabs which permitted over-recording from the tape.[6] Escalante demonstrated how it was possible to accidentally slide the tape recorder into the "record" position when intending only to stop the tape. Escalante adamantly denied making any promises of leniency to appellant or coercing appellant. He fervently maintained that he continuously recorded his and appellant's whole conversa-

tion, that he did not stop the tape during this process, and that no additional conversations were concealed by the over-records.

Our review of the tape transcript[7] confirms that neither of the two anomalies occurs in the portion of the tape where appellant admits killing the victim. The first interruption occurs during a discussion of a different crime[8] and the second one happens during appellant's discussion of entering the victim's apartment. The transcript appears to be consistent with only about a one second gap in the conversation in the latter case.

This inquiry distills to a question of witness credibility: (1) did the State use the over-records to intentionally attempt to disguise editing the tape in order to excise evidence of inappropriate promises made to the defendant, or (2) did these brief interruptions occur accidentally, obscuring nothing of value in the dialogue. There is adequate evidence here to support the latter conclusion that the anomalies were merely inadvertent and did not affect the overall reliability of the tape.[9] In other words, the evidence supports the position that the tape was accurate and had not been impermissibly "altered" in the sense contemplated by Article 38.22 § 3(a)(3). *Cf. Quinones v. State,* 592 S.W.2d 933, 944 (Tex.Crim.App.1980), *cert. denied,* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980) (based on *Edwards* requirements, not just any alteration renders a tape per se inadmissible: "If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of

---

**6.** In fact, Escalante said he never punched out the little tabs on tapes. When asked if he knew that the purpose of the removable tabs was to prevent over-records, he replied, "I do now."

**7.** The audio tape itself was not included with the record on appeal.

**8.** The jury did not see or hear this part of the statement during the guilt/innocence phase of this trial.

**9.** Appellant urges that the addition of Article 38.22 § 3(e) regarding strict construction of this article means the accuracy of a recording can no longer be shown by the testimony of a witness to the recorded conversation. Appellant provides no authority to support this assertion and we do not find his argument compelling.

the evidence, the recording can still be admitted"). The trial judge did not abuse her discretion in refusing to suppress the recorded statement and transcript at the guilt/innocence and punishment phases of trial. Appellant's second and third points of error are overruled.

■ In point of error four, appellant argues the trial court committed reversible error in failing to instruct the jury to disregard appellant's audio-taped statement and the transcription of that recording if they found the tape was inaccurate or had been altered. Appellant cites us to Article 38.23(a), which mandates that the jury be instructed to disregard evidence obtained in violation of the law if the issue is raised by the evidence.[10] Appellant asserts, because the recording lacked integrity due to the "skips" discussed above, he was entitled to have the jury resolve the issue of the accuracy of the tape under Article 38.23(a).

■ The Article 38.23(a) jury instruction requirement only applies when there exists a factual issue that evidence was *obtained in violation of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America. See Baker v. State,* 956 S.W.2d 19, 23 (Tex.Crim.App.1997) (Article 38.23(a) not implicated when violation of mere prophylactic measures at issue); *Janecka v. State,* 937 S.W.2d 456, 465 (Tex. Crim.App.1996), *cert. denied,* — U.S. ——, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997) (Article 38.23 only applies when evidence obtained via violation of law). The presence of skips or over-records on the audio-taped statement does not indicate the tape

was obtained in violation of the Constitution or a state or federal law, and appellant presented no evidence showing the skips were created as a result of a violation of the law. At worst, the anomalies could have rendered the tape inaccurate and, therefore, inadmissible (see our discussion of points of error two and three), but this was a determination for the trial judge, not the jury. *See* Article 38.22 § 3(a)(3); Tex R.Crim. Evid. 104(a).[11] Appellant was not entitled to an instruction under Article 38.23. Point of error four is overruled.

■ In point of error five, appellant again contends the trial court failed to give a jury instruction in violation of Article 38.23(a). He argues he was entitled to an instruction ordering the jury to ignore appellant's audio-taped in-custody statement and the transcription of the tape if it found appellant had not been advised of his right to contact the Mexican Consulate before making a statement to the police. Appellant cites Article 36 of the Vienna Convention on Consular Relations. Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, art. 36(1)(a), 21 U.S.T. 77, 100–101, 595 U.N.T.S. 261, 292 (ratified by the United States on Nov. 24, 1969).[12] Appellant asserts he is a Mexican citizen and emphasizes that Officer Escalante admitted he never mentioned the Mexican Consulate to him.

■ The Vienna Convention on Consular Relations grants a foreign national who has been arrested, imprisoned or taken into custody a right to contact his consulate and requires the arresting government authorities to inform the individu-

---

**10.** Specifically, Article 38.23(a) reads:
No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the

provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

**11.** This rule is now codified as Texas Rule of Evidence 104(a), effective March 1, 1998.

**12.** Appellant preserved error regarding this complaint by requesting an instruction on the requirements of the Vienna Convention at trial which was denied by the trial court.

al of this right "without delay." Vienna Convention, art. 36(1)(b), 21 U.S.T. at 100–101; 595 U.N.T.S. at 292; *see also Faulder v. Johnson,* 81 F.3d 515, 520 (5th Cir.), *cert. denied,* 519 U.S. 995, 117 S.Ct. 487, 136 L.Ed.2d 380 (1996). Article 38.23(a) provides that evidence obtained in violation of a federal or state law or constitutional provision shall not be admitted against the accused and mandates that the jury be instructed to disregard evidence obtained in violation of the law if the issue is raised by the evidence. Under the Supremacy Clause of the United States Constitution, states must adhere to United States treaties and give them the same force and effect as any other federal law. U.S. Const. Art. VI, cl. 2; *Hanson v. Town of Flower Mound,* 679 F.2d 497, 503 (5th Cir.1982); *see also Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). Thus, a violation of this treaty would arguably fall under the language in Article 38.23(a) if the issue is raised by the evidence. *Compare Cardona v. State,* 973 S.W.2d 412, 417–18 (Tex.App.-Austin 1998) (finding violation of treaty merited exclusion of evidence under Article 38.23(a), but holding error did not affect defendant's substantial rights). In order to warrant the Article 38.23 instruction, a factual issue must be raised concerning whether evidence was obtained in violation of the treaty. *See Bell v. State,* 938 S.W.2d 35, 48 (Tex.Crim.App.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997).

Only if appellant is a foreign national did authorities have an obligation to notify him of his right to consular access. Testimony at trial showed that appellant lived in Mexico when he was a child and that is where he knew the victim's son, Augustin Saucedo. This evidence does not preclude the possibility that appellant became a United States citizen after coming to this country. Other evidence showed appellant had lived in the United States for many years, spoke some English, had a Texas driver's license, and had purchased a car in the United States. No one testified that applicant was not a United States citizen. In sum, trial evidence did not show appellant was a Mexican citizen. Therefore, appellant was not entitled to an instruction under Article 38.23. *See id.* Appellant's fifth point of error is overruled.

■ Appellant next contends, in point of error six, that the trial court should have suppressed his recorded statement because the statement was not freely and voluntarily made. Appellant notes he testified at the suppression hearing that Officer Escalante had promised to help him with the prosecutors if he made a statement. He insists such a promise would render the resulting statement inadmissible.

■ As a general rule, appellate courts should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman,* 955 S.W.2d at 89. Appellate courts should afford the same amount of deference to trial courts' rulings on "application of law to fact questions" if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.*

In the instant case, at the suppression hearing, appellant claimed Escalante repeatedly offered to speak to the prosecutor on his behalf:

> And he told me not to be stupid, because if not, he was going to take me down. And he told me that if I would talk, that he was going to talk to the prosecutor so that they could help me out some way.

However, Escalante vehemently denied making promises or otherwise using coercion to convince appellant to confess. When faced with appellant's claims, he asserted: "I would never make a promise like that." Thus, the determination of the factual basis of appellant's claim turned on an evaluation of the credibility and demeanor of these two primary witnesses.

In such a situation, we have recognized the trial court's superior position. *See Guzman, supra.* In this case, we cannot say the court abused its discretion. We overrule appellant's sixth point.

■ In his seventh point of error, appellant argues the evidence is insufficient to support his conviction, as a matter of law, because the State alleged the victim's name was Cruz C. Saucedo when the victim's real name was Primo Correa Saucedo. The indictment and the charge list the victim's name as Cruz C. Saucedo. However, the victim's son testified at trial that his father's given name was Primo Correa Saucedo. Appellant contends this discrepancy represents a "fatal variance" in the State's pleadings.

When a person is known by two or more names, Article 21.07 allows the State to allege either name in the indictment.[13] *Blankenship v. State,* 785 S.W.2d 158, 159 (Tex.Crim.App.1990). In the instant case, Augustin testified on redirect examination that his father was known as Cruz C. Saucedo. Therefore, the evidence at trial was sufficient to show the individual

named in the indictment was the victim and no fatal variance existed. We overrule appellant's seventh point of error.

Appellant's final four points of error concern the voir dire process. In point eight, appellant alleges the trial court committed reversible error in failing to strike prospective juror Davis for cause where the venireman stated he could not give the trial his full attention.

■ Appellant cites no article in the Code of Criminal Procedure, rule, or judicial opinion in support of his argument that Davis should have been excluded for cause. Article 35.16 lists the reasons justifying challenges for cause, but does not include a provision for "could not give the trial his full attention." A trial court does not abuse its discretion for failing to grant a challenge for cause on the basis of a reason not expressly enumerated in Article 35.16.[14]

The relevant portion of Venireman Davis's responses follows:

---

**13.** The relevant portion of Article 21.07 reads:

In alleging the name of the defendant, or of any other person necessary to be stated in the indictment, it shall be sufficient to state one or more of the initials of the given name and the surname. When a person is known by two or more names, it shall be sufficient to state either name.

**14.** There are two opposing lines of cases pertaining to whether Article 35.16 contains a comprehensive list. *Moore v. State,* 542 S.W.2d 664 (Tex.Crim.App.1976), and its progeny hold that challenges for cause can be properly asserted on grounds not specifically enumerated in Article 35.16 if the facts show the prospective juror would be "incapable or unfit to serve on the jury." *Mason v. State,* 905 S.W.2d 570, 577 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 670 (1996). Such challenges are typically left to the sound discretion of the trial judge. *Mason, supra.* This Court has held, where the record as a whole indicates the prospective juror's personal affairs would not prevent or impair his performance of his duties and would not keep him from being a fair and impartial juror, the trial court does not abuse its discretion in refusing to strike

the juror. *Burks v. State,* 876 S.W.2d 877, 896–97 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995).

*Moore* and its progeny were overruled by *Butler v. State.* 830 S.W.2d 125, 130 (Tex. Crim.App.1992), which held that Article 35.16 "is a complete list of challenges for cause." The Court noted there, however, that article 35.03 provided no enumerated bases for excusing a venireperson at any time during the voir dire.

Curiously, *Moore* was revived after *Butler, supra,* by *Mason v. State., supra.* Like *Moore, Mason* held that challenges for cause could be properly asserted on grounds not specifically enumerated in Article 35.16, where the challenge "is based on facts that show that the prospective juror would be 'incapable or unfit to serve on the jury.'"

Regardless of which line of cases is now prevailing, even under *Mason,* a trial court is not *required* to grant a challenge for cause not enumerated in Article 35.16. Rather, challenges not based upon a ground specifically enumerated in Article 35.16 are addressed to the sound discretion of the trial judge. *Mason* 905 S.W.2d at 577.

Q: [by the Prosecutor] I think we've talked about whether or not you have any problems in serving around the 29th. Oh, you did say—you said yes?

A: Well, I run a business. But, I mean, it's no different than anybody else's problem. I'm sure everybody's got them. I run a business.

Q: You think you can work around this without having any impact on your service?

A: I would definitely have to get some other personnel in there and everything else or it would be a hardship.

Q: Right.

A: Just as much as anybody.

Q: Could you devote your concentration to this trial while you're there at the trial? ... You think you could handle that with your business?

A: My mind's going to be on my business. I'm going to have to be honest about that.

Q: Right.

A: But I'll do the best I can.

Q: What I'm saying: Everybody's mind is on, you know, how they make a living?

A: Yes, sir.

Q: Could you also devote your full attention to the evidence that is before you?

A: I'll say, I'll do my best.

Q: And, I guess, from you saying you're doing your best, you're not going to do anything in this trial or—or, you know, not listen to evidence or do anything like that because you're so concerned about your business? You wouldn't do that, you wouldn't—

A: Not intentionally, no, sir. Not intentionally.

\* \* \*

Q: [by Defense Counsel] ... And just touching up on what [the Prosecutor] was talking about your job, and you said

it was going to be a hardship for you, right?

A: Just—yeah. I run—own a business.

Q: Yeah. And because it's a hardship, I believe you also said that your mind's going to be on your job as well; is that right?

A: I'll certainly do my best to, you know, be a good juror, if that's what I need to do. But, yes, sir, I'm afraid in the back of my mind, that I'm going to be thinking about my business the whole time I'm gone. On the phone, every time I have a break, you know.

Q: Do you think that that would have some impact on your ability to sit for a week, maybe two weeks—two-week trial listening to evidence and perhaps maybe that might have some impact on your ability to pay full attention to this trial here sir?

A: I would hope not. But it's possible, yes, sir.

On the basis of this testimony, the trial court could have concluded that, although he might be thinking about his company 'in the back of his mind,' Davis would dedicate himself to fulfilling his duties as a juror. On these facts we cannot say the trial court abused its discretion by overruling appellant's challenge for cause. We overrule appellant's eighth point of error.

■ In point nine, appellant complains that the trial court erred in refusing to grant his challenge for cause to prospective juror Jacobs because he said he would take into consideration appellant's decision not to testify. Appellant emphasizes his constitutional right for the jury not to consider his election not to testify as evidence of guilt. He asserts Jacobs' statement that he thought appellant's decision not to testify might be "a missing link in the chain" shows that he was biased against the law on which appellant was entitled to rely. Article 35.16(c)(2).

The trial record reveals that prospective juror Jacobs really struggled with the question of whether he would consider ap-

pellant's failure not to testify as evidence of guilt. First, the prosecutor explained the law to him and he hesitatingly conceded that, if he were torn as to whether appellant were guilty, the fact appellant did not testify would not throw him over the edge toward a finding of guilt. As defense counsel further probed Jacobs' feelings on the matter, he admitted the fact that appellant had chosen not to testify "would be in the back of [his] mind." When the prosecutor then presented him with a hypothetical situation in which he thought the defendant was guilty, but retained a reasonable doubt, Jacobs said the fact that the defendant did not testify would not take away his reasonable doubt: "No, ma'am, I couldn't do that to anyone." Finally, when defense counsel sought to clarify his position, Jacobs stated he would not hold the fact that a defendant chose not to testify against that person.

■ When a potential juror's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Colburn v. State,* 966 S.W.2d 511, 517 (Tex.Crim.App.1998); *Brown v. State,* 913 S.W.2d 577, 580 (Tex. Crim.App.1996). We follow this approach because we recognize that elements such as demeanor and tone of voice are critical to understanding the juror's precise position. *See Earhart v. State,* 823 S.W.2d 607, 627 (Tex.Crim.App.1991), *vacated on other grounds,* 509 U.S. 917, 113 S.Ct. 3026, 125 L.Ed.2d 715 (1993). In the instant case, as summarized above, Jacobs vacillated and gave responses which seem contradictory, yet exhibited an inclination to follow the law. In such a situation we defer to the trial court's informed judgment on the matter. *See Earhart, supra* (we deferred to trial court where, when fully questioned, veniremember indicated he would not hold failure to testify against defendant). Appellant's ninth point of error is overruled.

■ Appellant next complains the trial court improperly denied his challenge for cause to venireman Carter. Appellant alleges Carter said he would only consider the facts and circumstances of the offense and would not consider appellant's character and background in answering the second and third punishment issues. Appellant argues this approach offends the spirit of the Supreme Court's holding in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). He contends the jurors must be willing to consider a defendant's general character as mitigation evidence during the punishment phase of trial.

■ In compliance with *Penry, supra,* Article 37.071 § 2(e) of the Texas Code of Criminal Procedure requires the trial court to instruct the jury to answer the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See* Article 37.071 § 2(e).[15] Thus, jurors must be willing to at least *consider* the defendant's background and character in answering this punishment issue, although they need not give *mitigating weight* to any particular type of evidence. *See Penry,* 492 U.S. at 319, 109 S.Ct. at 2947; *Eddings v. Oklahoma,* 455 U.S. 104, 113–15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Rachal v. State,* 917 S.W.2d 799, 813 (Tex. Crim.App.), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996); *Coleman v. State,* 881 S.W.2d 344, 351 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995).

---

**15.** Because no parties charge was given at the guilt/innocence phase, the jury was only given two punishment questions, not three. *See* Article 37.071 § 2(b)(2).

In the instant case, after contradicting himself and expressing some amount of confusion on this issue, venireman Carter finally told the prosecutor that he would consider all of the evidence presented at the punishment phase, including evidence of character and background, in deciding how to answer the mitigation question. Because this juror vacillated, then expressed his willingness to consider character and background evidence, we will defer to the trial court's discretion in denying appellant's challenge for cause. *See Colburn,* 966 S.W.2d at 517. Appellant's tenth point is overruled.

■ In his final point of error, appellant argues the trial court reversibly erred in its refusal to strike venireman Kegans for cause. Appellant claims Kegans said, after having found a defendant guilty of capital murder, he would be predisposed toward answering the punishment questions in such a way that the defendant would receive the death penalty. Appellant maintains Kegans' position offended the principle that jurors must be able to consider the full range of punishment for the crime.

Venireman Kegans indicated that, after having found a defendant guilty of capital murder and answering affirmatively the first punishment question regarding whether the defendant would be a future danger, he would tend to be predisposed toward the death penalty. However, he repeatedly stated he would consider all of the evidence in answering each of the punishment questions and his decision would depend on the particular circumstances presented. Because this veniremember indicated he would answer the punishment questions based on the evidence and not simply as an automatic response, he was not subject to a challenge for cause. *Garcia v. State,* 887 S.W.2d 846, 858–59 (Tex. Crim.App.1994), *cert. denied,* 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). Appellant's eleventh point of error is overruled.

We affirm the judgment of the trial court.

PRICE, J., filed a concurring opinion in which JOHNSON, J., joined.

WOMACK, J., delivered a concurring opinion in which McCORMICK, P.J., and MANSFIELD and KELLER, JJ., joined.

PRICE, J., delivered a concurring opinion in which JOHNSON, J. joined.

I join the opinion of the Court but write separately regarding point of error eight. Nothing in the literal text of Article 35.16 indicates that the legislature intended the list of challenges for cause be an exclusive one. *See Boykin v. State,* 818 S.W.2d 782, 785–86 (Tex.Crim.App.1991). Trial courts have the discretionary power to dismiss prospective jurors at any time for reasons not explicitly articulated in Article 35.16, whether it be on motion of the parties, request of the juror himself, or *sua sponte.* Some examples of circumstances where such an action is necessary include jurors who seem to be too preoccupied with their own personal lives to perform their duties as a juror conscientiously, jurors whose intelligence or vocabulary is so limited that they cannot understand the routine words and concepts used in the trial, and jurors who are too nervous and distraught at the proposition of jury service to do a good job. Trial courts must have the authority to exercise their judgment when considering these as well as any other facts which would render a prospective juror incapable or unfit to serve. With these comments, I join the opinion of the Court.

WOMACK, J., filed a concurring opinion, in which McCORMICK, P.J., and MANSFIELD and KELLER, JJ., joined.

I do not join the discussion of the "two opposing lines of cases" on challenges for cause, *ante* at 248 n. 14. There was an incorrect line of cases which had created from whole cloth the notion that there were grounds of challenge for cause that were not in Article 35.16 of the Code of

Criminal Procedure. This line of cases began with *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), and was necessary to the decision of only two or three other cases: *See Allridge v. State*, 850 S.W.2d 471, 484 (Tex.Cr.App.1991); *Rogers v. State*, 774 S.W.2d 247, 253–54 (Tex.Cr.App. 1989) (*semble*); *Chambers v. State*, 568 S.W.2d 313, 320 (Tex.Cr.App.1978).[1]

This short line was overruled in *Butler v. State*, 830 S.W.2d 125, 130 (Tex.Cr.App. 1992) (*per curiam*), when the Court said "some past cases … are disavowed." The past cases were identified in a footnote only as, "For example, *Moore* and its progeny." *Id.* at 130 n. 10. This was a careless way to overrule a line of cases, since the citation services can scarcely be expected to identify the progeny of *Moore* which have been disavowed. And the researcher who relies on disavowed cases without tracing their genealogy back to *Moore* will not know from the citation services that reliance is being placed on bastard progeny. But that was the state of the law books when the Court decided *Mason v. State*, 905 S.W.2d 570 (Tex.Cr.App.1995).

In *Mason* the State's challenge for cause to a juror who "would be unable to fully concentrate on the case if he was required to miss too much school" was upheld on the basis of two of *Moore's* progeny. *See Mason v. State*, 905 S.W.2d at 577 (citing *Allridge v. State, supra*, and *Nichols v. State, supra* n.*). I do not agree with the Court's assessment that, "Curiously, *Moore* was revived after *Butler, supra* by *Mason v. State,*" *ante* at 248 n. 14. I think that the *Mason* Court correctly denied a point of error, mistakenly citing two of the progeny of *Moore* which had been overruled in a careless way.

The *Mason* Court should have denied the point of error by holding, as the *Butler* Court did, that a trial judge may use the authority of Code of Criminal Procedure article 35.03 to excuse a potential juror who is found to be too distracted by personal duties to carry out the duty of a juror. *Accord, Kemp v. State*, 846 S.W.2d 289, 293 (Tex.Cr.App.1992) (trial courts have "inherent authority under Article 35.03," Code of Criminal Procedure, which gives them "broad discretion in excusing prospective jurors on any proper basis, either with or without the prompting of counsel"). If we did so today, while explicitly overruling *Mason* and the progeny of *Moore* which I have cited above, *supra* at 252 and n. 1, we would dispel, rather than compound, the confusion that our decisions in *Butler* and *Mason* have created.

I join the judgment of the Court and the remainder of its opinion.

---

1. The *Moore* holding was repeated as dictum at another point in *Chambers; see* 568 S.W.2d at 323.

   The *Moore* holding also was repeated as dicta in other opinions, but it was not necessary to the decisions. *See Burks v. State*, 876 S.W.2d 877, 896 (Tex.Cr.App.1994) (non-statutory challenge properly overruled); *Teague v. State*, 864 S.W.2d 505, 512 (Tex.Cr.App. 1993) (point was not preserved); *Harris v.* *State*, 784 S.W.2d 5, 28 (Tex.Cr.App.1989) (non-statutory challenge properly overruled); *Sosa v. State*, 769 S.W.2d 909, 917–18 (Tex. Cr.App.1989) (juror properly excused on statutory ground); *Nichols v. State*, 754 S.W.2d 185 (Tex.Cr.App.1988) (harm was not shown in any event); *Henley v. State*, 644 S.W.2d 950, 957 (Tex.App.—Corpus Christi 1982) (non-statutory challenge properly overruled).