Benjamin Trinidad TRUJILLO,
Appellant,

v.

The STATE of Texas, Appellee.

No. 09–97–528 CR.

Court of Appeals of Texas,
Beaumont.

March 22, 2000.

George E. Renneberg, Law Offices of William E. Hall, Jr., Conroe, for appellant.

Michael A. McDougal, Dist. Atty., Gail Kikawa McConnell, Asst. Dist. Atty., Peter C. Speers, III, Asst. Dist. Atty., Conroe, for state.

Before WALKER, C.J., BURGESS and STOVER, J.J.

## OPINION ON RECONSIDERATION

DON BURGESS, Justice.

Pursuant to Tex.R.App. P. 50, we withdraw our opinion of January 26, 2000, and substitute the following in its place.

A jury convicted Benjamin Trujillo of murder and assessed punishment at twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division. Trujillo raises a single issue on appeal contending the trial court erred in denying his motion to suppress two written statements.

## BACKGROUND

During the investigation of the murder, Trujillo twice gave the police written statements indicating he shot his employer, Joseph Sanchez, at Sanchez's place of business. According to Trujillo's last statement, Sanchez had been harassing him at work for approximately three weeks prior to the murder. Trujillo stated that after arriving at work on March 5, 1997, while sweeping around the office desk, he saw a gun. Trujillo picked up the gun, intending to scare Sanchez in the hope that he (Sanchez) would stop insulting him. According to Trujillo, he was "waiting for him, Sanchez, with the pistol in [his] hand.... The pistol went off."

## · ANALYSIS

The basis for Trujillo's motion to suppress is the State's violation of a provision of the Vienna Convention treaty. Article 36(1)(b) of the Vienna Convention on Consular Relations provides:

> [I]f he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody[,] or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph....*

Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, art. 36(1)(b), 21 U.S.T. 77 (ratified by the United States on Nov. 24, 1969) (emphasis added). The provision requires a foreign national who has been "arrested or committed to prison or to custody pending trial or is detained in any other manner" to be notified of his rights under the treaty. Trujillo contends that because the two written statements were obtained in viola-

tion of the treaty, they must be excluded from evidence in accordance with TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2000), which requires the exclusion of evidence obtained in violation of any provision of a constitution or of federal or state law.

■ The State contends Trujillo does not have standing to raise such a claim because the treaty does not provide for enforcement of its provisions by an individual. We have recently addressed this issue and held that foreign nationals do have standing to raise error based upon a violation of the treaty. *See Zapata v. State*, 12 S.W.3d 178, 183 (Tex.App.—Beaumont 2000, no pet. h.).

■ The State further argues the Vienna Convention does not purport to provide substantive rights to a foreign national in the criminal justice system of the United States. We addressed this issue in *Zapata* as well, finding "it is not the Vienna Convention which gives substance to the right, but the law of the State of Texas which provides evidence obtained in violation of any law of the United States is to be excluded from a criminal case. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon Supp.2000)." *Id.* at 183–84.

■ The Court of Criminal Appeals recently commented on the Vienna Convention treaty and its application:

> Article 38.23(a) provides that evidence obtained in violation of a federal or state law or constitutional provision shall not be admitted against the accused and mandates that the jury be instructed to disregard evidence obtained in violation of the law if the issue is raised by the evidence. Under the Supremacy Clause of the United States Constitution, states must adhere to United States treaties and give them the same force and effect as any other federal law. U.S. Const. Art. VI, cl. 2; ... *see also Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). Thus, a violation of this treaty would arguably

fall under the language in Article 38.23(a) if the issue is raised by the evidence. *Compare Cardona v. State,* 973 S.W.2d 412, 417–18 (Tex.App.—Austin 1998 [no. pet.] ) (finding violation of treaty merited exclusion of evidence under Article 38.23(a), but holding error did not affect defendant's substantial rights).

*Maldonado v. State,* 998 S.W.2d 239, 247 (Tex.Crim.App.1999). Thus, under *Maldonado,* a foreign national arrested, imprisoned, taken into custody, or otherwise detained has a right to contact his consulate. *See id.* at 246. The government authorities responsible for any such action toward a foreign national are required to inform the individual of this right. *Id.* at 246–47; *see* Vienna Convention, art. 36(1)(b). If a foreign national is not so informed, the treaty has been violated. *See id.* at 247. A violation of the treaty constitutes a violation of "the law" as that termed is used in article 38.23(a). *See id.* If an issue has been raised that the evidence sought to be excluded was "obtained in violation of the law," the evidence is subject to exclusion under article 38.23(a). *See id.*

■ The State concedes in its petition for discretionary review that Trujillo is a Mexican citizen. The State does not contest that Trujillo was "detained" within the meaning of the treaty and the record establishes Trujillo was not informed of his rights under the treaty. Accordingly, the issue before this court is whether the failure to inform Trujillo of his rights under the treaty requires the exclusion of his two written statements under article 38.23.

In considering the relationship between a violation of the treaty and art. 38.23(a), the court in *Maldonado* stated "a violation of this treaty would arguably fall under the language in Article 38.23(a) *if* the issue is raised by the evidence." *Id.* at 247 (emphasis added). The State contends Trujillo must establish a "causal connection" between the failure to inform him of his rights and the giving of his statements to police. We agree.

In *Zapata,* we determined that because there was no evidence the statement was "obtained" as a result of the violation of the treaty, the trial court did not abuse its discretion in admitting the statement. *See Zapata,* at 184–85. Relying upon *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529, 537 (1998), we found there must be some showing the violation had an effect. *See Zapata,* at 183–84. We noted:

> The Court found that under the Antiterrorism and Effective Death Penalty Act, Breard was not entitled to an evidentiary hearing because he failed to develop the factual basis of his claim in State court proceedings. *Breard,* 523 U.S. at 376–77, 118 S.Ct. at 1355–56, 140 L.Ed.2d at 538. The court then noted "[t]his rule prevents Breard from establishing that the violation of his Vienna Convention rights prejudiced him. Without a hearing, Breard cannot establish how the Consul would have advised him, how the advice of his attorneys differed from the advice the Consul could have provided, and what factors he considered in electing to reject the plea bargain that the State offered him." *Id.*

*Zapata,* at 184. The Court's comments in *Breard* make it clear that a defendant must do more than show his rights under the treaty were violated—he must demonstrate how that violation prejudiced him. We find support for our interpretation in the recent decision by the Court of Criminal Appeals in *Chavez v. State,* 9 S.W.3d 817 (Tex.Crim.App.2000). In *Chavez,* the court stated:

> *Johnson* and *Daugherty* decided Article 38.23(a) should be construed according to its "plain" language with Article 38.23(a)'s "obtained" given its "ordinary meaning" unless this would lead to "absurd results." [*Johnson v. State,* 871 S.W.2d 744, 749–51 (Tex.Cr.App.1994); *State v. Daugherty,* 931 S.W.2d 268, 270 (Tex.Cr.App.1996) ]
>
> . . . .

In addition, under both *Johnson* and *Daugherty,* the "plain" language of Article 38.23(a) does not require exclusion of the [evidence]. No "ordinary person" would consider the [evidence] to have been "obtained" in violation of the law. *See Daugherty,* 931 S.W.2d at 270 (Article 38.23(a) rejects a strict "but/for" test of causation between the illegality and seizure of the evidence). Any causal relationship ... is too remote for Article 38.23(a) to consider the [evidence] to have been "obtained" by the "illegality...." *See Daugherty,* 931 S.W.2d at 270 (ordinary meaning of "obtained" does not extend to remote causal relationships).

*Chavez,* 9 S.W.3d at 819–20. Thus, in *Chavez,* the court rejected a "but/for" test of causation but concluded the causal relationship was too remote for the evidence to have been obtained by the illegality within the meaning of article 38.23(a). *Id.* While we did not refer to *Chavez* in *Zapata,* it is clear we applied its reasoning and we do so again in this case.

As in *Zapata,* an "ordinary person" would not consider evidence to have been "obtained" by the failure to inform a defendant of his rights to contact the Consul absent any evidence that the defendant would have done so or how the Consul would have advised him. This is particularly true in a case such as this one, as in *Zapata,* where the defendant had already waived his right to have an attorney present.[1] *See Zapata,* at 184–85.

The State uses the term "causal connection," but that term connotes a strict "but/for" requirement that is inappropriate. Therefore, we decline its use and instead hold only, as we did in *Zapata,* that there must be a showing the failure to inform

the defendant of his rights under the treaty had a prejudicial effect on the defendant's decision to provide the statements. In the instant case, there has been no such showing; thus, there is no evidence the evidence was "obtained" in violation of the law. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2000).

## CONCLUSION

Accordingly, we find the trial court did not abuse its discretion in denying the motion to suppress. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Trujillo's sole issue is overruled and the judgment of the trial court is AFFIRMED.

EARL B. STOVER, Justice, dissenting.

As I appreciate the majority opinion, we are in agreement that a violation of the Vienna Convention treaty occurred: Trujillo was not told of his right to request that the consular post be informed that "a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." *See* Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, art. 36(1)(b), 21 U.S.T. 77 (ratified by the United States on Nov. 24, 1969). Where I part company with the majority is in the determination of the proper analysis to be performed once that conclusion is reached.[2]

At the outset, it must be stressed that in finding the existence of individual rights in the provisions of Article 36 of the Vienna Convention, we are faced with a legal construct for which we have no substantive precedent. We must, therefore, look to existing case law dealing with similar issues and then make some reasonable ex-

---

1. Trujillo signed a written waiver of his right to counsel. At the hearing on the motion to suppress Trujillo asserted he asked for an attorney prior to giving the written statements. No issue of voluntariness was raised on appeal.

2. Although I was part of the unanimous opinion of this Court in *Zapata v. State,* 12 S.W.3d 178 (Tex.App.—Beaumont 2000, no pet. h.), I have now reconsidered my position regarding the causal connection analysis therein and refer the reader instead to my dissent in the instant opinion.

trapolations to the circumstances in the case before us. The State contends that in view of *Johnson v. State*, 871 S.W.2d 744 (Tex.Crim.App.1994), the word "obtained" in Art. 38.23 requires a showing of the "causal connection" between the violation of law and the evidence. The State further contends that, based upon *Breard v. Greene*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998), this "causal connection" is somehow related to prejudice or harm and it is the defendant's burden to make such a showing in order for the evidence to be held inadmissible.

As the majority notes, the State does not contest that Trujillo was "detained" within the meaning of the treaty. It follows then that if Trujillo was "detained in any other manner," as stated in the treaty, and the detention was in furtherance of interrogating Trujillo about the ongoing murder investigation, the failure by law enforcement authorities to give the required information under the treaty rendered Trujillo's detention illegal. From that illegal detention flowed the inculpatory statements given by Trujillo to police. If a "causal connection" is required, as the majority posits, the causal connection is present in the instant case as a continuum between the violation (failure by officers to inform Trujillo of his rights under the treaty prior to interrogating him, which rendered his detention illegal) and the subsequently elicited inculpatory statements. Thus, it can be said that the statements ultimately were the product of the initial violation. As I appreciate it, the question then becomes whether, under well-established precedent, the taint of the illegal detention was eventually attenuated so as to make the resulting inculpatory statements admissible.

It is instructive to note that the *Johnson* Court, upon which the State relies, held that "the attenuation doctrine is applicable to Art. 38.23's prohibition against evidence 'obtained' in violation of the law because evidence sufficiently attenuated from the violation of the law is not considered to be 'obtained' therefrom.... Thus, the attenuation doctrine is not an exception to Art. 38.23, but rather is a method of determining whether evidence was 'obtained' in violation of the law, with 'obtained' being included in the plain language of the statute." *Johnson*, 871 S.W.2d at 750–751.

"Taint attenuation" is the concept by which the *State*, once the defendant has introduced evidence of some police misconduct termed the "primary taint" (i.e., illegal arrest, unreasonable search or seizure, improper detention, etc.) from which evidence directly or indirectly results, *has the burden* of proving the evidence has not come about by exploitation of the primary taint, but instead has come about by means sufficiently distinguishable to be purged of the primary taint. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441, 455 (1963). The Court in *Brown v. Illinois* described the analysis to be used:

> In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." (citation omitted). Wong Sun thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.

*Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416, 426 (1975).

> It is entirely possible, of course, as the State here argues, that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the Miranda warnings, *alone* and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that

the Fourth Amendment violation has not been unduly exploited.

*Id.,* 422 U.S. at 603, 95 S.Ct. 2254.

The Court in *Brown,* and in subsequent cases such as *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), fashioned a test "designed to vindicate the 'distinct policies and interests of the Fourth Amendment.'" *Dunaway,* 442 U.S. at 217, 99 S.Ct. 2248 (quoting *Brown,* 422 U.S. at 602, 95 S.Ct. 2254). As fashioned, the *Brown* taint attenuation factors are: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the official misconduct and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown,* 422 U.S. at 603–604, 95 S.Ct. 2254.

The State, in its "causal connection" argument, is apparently urging the need for what amounts to a "but for" showing. Such a showing has been explicitly rejected by both the U.S. Supreme Court and the Court of Criminal Appeals. *See Dunaway,* 442 U.S. at 217, 99 S.Ct. 2248 ("Following Wong Sun, the Court eschewed any per se or 'but for' rule, and identified the relevant inquiry as 'whether Brown's statements were obtained by exploitation of the illegality of his arrest[.]'") (citations omitted). *Lewis v. State,* 664 S.W.2d 345, 348 (Tex.Crim.App.1984) ("As *Wong Sun* teaches, showing that a search was come at by exploitation of the primary illegality requires more than showing a mere 'but-for' relationship[.]").

In summary, the proper focus of the analysis regarding Trujillo's Art. 38.23 claim should be a determination of whether the primary taint has been purged or erased so as to permit admission of Trujillo's statements made during police interrogation while "detained in any other manner" by the police without first having been informed of his rights under the Vienna Convention [primary taint]. Such an analysis would necessitate the application of the four *Brown* attenuation factors. Whatever a "causal connection" analysis

may be, I believe it to be subsumed within a reviewing court's attenuation analysis using the four *Brown* factors.

In examining the record for taint attenuation purposes, I first note it is undisputed that Trujillo was provided with his *Miranda* warnings prior to the taking of both statements. This factor mitigates in favor of the State. However, unlike analyses in which the "taint" involves an illegal arrest or improper search and/or seizure which, in turn, involve a *tainting event* that has a definite beginning and ending, in the instant case we are presented with a continuing *omission* on the part of the authorities. This continuing omission is the *tainting event* upon which the remaining *Brown* factors are to be analyzed. Indeed, with regard to the next two *Brown* factors, (temporal proximity of the tainting event and the statements, and presence of intervening circumstances), the fact that appellant was continually unaware of his right to consult with a consular representative from Mexico, prior to undergoing interrogation, I believe, fatally mitigates against the State.

The temporal proximity factor is based upon the reasoning that the shorter the time between the tainting event and the taking of the statement the more likely the tainting event has not been purged. *See Maixner v. State,* 753 S.W.2d 151, 156 (Tex.Crim.App.1988). In the instant case, however, the tainting "event" is continuous; appellant is *never* made aware of the provisions of the Vienna Convention treaty. Therefore, the tainting "event" is never purged. The same is true of the "presence of intervening circumstances" factor. Because the tainting "event"—the detention in order to interrogate him without first informing him of his right to contact the consul—is ongoing, no circumstances can possibly intervene since Trujillo's statements were taken without his ever being informed of his rights under the Vienna Convention. Again, until Trujillo is so informed, taint continues to attach to the statements elicited from him.

The fourth factor, purpose and flagrancy of the official misconduct, also mitigates against the State. While the purpose of the failure to inform Trujillo of his Vienna Convention treaty rights is not clear from the state of the record, the fact that he was never informed speaks for itself as to "flagrancy of the misconduct."[3] Furthermore, because the police initiated the encounter with Trujillo in order to question him about his personal belongings found at the crime scene, it is clear that the initial encounter and subsequent detention of Trujillo "had a quality of purposefulness" and was an "expedition for evidence" undertaken "in the hope that something might turn up." *Brown,* 422 U.S. at 605, 95 S.Ct. 2254. I conclude, therefore, that the State failed in its burden to show, by clear and convincing evidence, that the continuing taint of failing to inform Trujillo of the provisions of the Vienna Convention during the interrogation process was removed from the incriminating statements taken from him following his detention. The trial court abused its discretion in failing to suppress said statements.

A finding that the taint has not been sufficiently removed does not end the inquiry, however. A harm analysis must then be conducted. *See Jones v. State,* 833 S.W.2d 118, 126 (Tex.Crim.App.1992). Trujillo does not claim on appeal that a constitutional error was committed by the trial court; instead, the gravamen of his complaint is that his statements were obtained "in violation of a United States treaty" and were "used in a court in violation of a Texas statute [art. 38.23] over the timely objection of Appellant prior to trial...." He further maintains that his written statements, which were both admitted at trial, "were instrumental in con-

victing" him. Although numerous witnesses testified at trial, he contends none of them "could inculpate [him]." "Only the officer who took statements from [Trujillo] ... could connect [him] with the crime...."

In a case with similar issues, *Cardona v. State,* 973 S.W.2d 412 (Tex.App.—Austin 1998, no pet.), the Austin court of appeals was confronted with allegations of a violation of the Vienna Convention treaty. Like the appellant in the instant case, Cardona, a Mexican national, filed a motion to suppress statements he had made to the State's investigator prior to trial. *Id.* at 414. Because the State failed to inform Cardona without delay of his right to access the Mexican consulate, the appellate court concluded the treaty was violated and then proceeded to perform a harm analysis under Tex.R.App.P. 44.2(b). *Id.* at 417-18.

**44.2 Reversible Error in Criminal Cases.**

. . . .

(b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

Tex.R.App. P. 44.2(b). In conducting a similar analysis in the instant case, I would hold, under the record herein, that Trujillo's substantial rights were affected.

The evidence at trial was entirely circumstantial. No one saw or heard Trujillo at the shop around the time of the murder, and no fingerprints were found on the gun. Officer Davis testified there may have been some prints made at the crime scene, but he was not sure; none were offered into evidence. Atomic absorption tests were performed on Trujillo, Joseph San-

---

**3.** In using the phrase "flagrancy of the misconduct," I do not mean in any way to infer that the police personnel involved in the instant case acted unprofessionally or exhibited any animus toward Trujillo during his detention and interrogation. While courts of this State have long held that all persons, including law enforcement personnel, are presumed to know the law, *see Hayes v. State,* 672 S.W.2d 246, 248 (Tex.App.—Beaumont 1984,

no pet.), *citing Crain v. State,* 69 Tex.Crim. 55, 153 S.W. 155 (1913), I realize that the existence of the provisions of the Vienna Convention treaty may have been something new to the particular police personnel involved with Trujillo. I use the term "flagrancy of the misconduct" because that is the term used by the Court in *Brown,* and not to indicate any malice on the part of the individual police officers or detectives toward Trujillo.

chez, the deceased, and Mario Sanchez, the deceased's brother, to detect any gun powder residue on their hands. No test results were offered into evidence. Although the murder occurred on March 5, 1997, it was not until two days later, on March 7, that investigators found a Bible, a cassette tape, and a lunch, all purportedly belonging to Trujillo, at Sanchez's place of business. Officer Perez, who did not become involved in the case until March 7, testified he did not know if those items were at the shop on March 5. "We didn't see them on the 5th...." Darlene Sanchez, wife of the deceased, testified she had no knowledge of any problems between her husband and Trujillo. Mario Sanchez testified there might have been a misunderstanding between his brother and Trujillo, but he also acknowledged he never heard his brother "counsel" Trujillo about his work. According to Mario, his brother had fired Trujillo some two and a half years earlier. However, Trujillo was working at the shop at the time of the murder.

After examining the record as a whole, I find there is a paucity of evidence, all of which is circumstantial, connecting Trujillo to the crime. Trujillo's written statements, which were admitted into evidence at trial, not only connect him to the murder, but they also establish he shot Sanchez, a fact which is not established by any other evidence. I am, therefore, unable to say with fair assurance that the erroneous admission of Trujillo's statements did not influence the jury, or had but a slight effect, or that their admission did not affect appellant's substantial rights. *See Johnson v. State*, 967 S.W.2d 410 (Tex. Crim.App.1998). I would hold the trial court abused its discretion in denying the motion to suppress, sustain appellant's issue, reverse the trial court's conviction, and remand the case for a new trial.

Therefore, I respectfully dissent.