TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







ON MOTION FOR REHEARING









NO. 03-98-00007-CR






Daniel Carl Greeley, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 973133, HONORABLE BOB PERKINS, JUDGE PRESIDING







 The opinion and judgment issued herein on March 2, 2000 are withdrawn, and the
following opinion is substituted for the earlier one.

 Appellant Daniel Carl Greeley was convicted of capital murder for intentionally
causing the death of Bruce Becker in the course of committing robbery. See Tex. Penal Code
Ann. §§ 19.02(b)(1), .03(a)(2) (West 1994). Greeley defended the charge on the grounds that he
acted in self-defense or sudden passion and did not intend to kill Becker. In twenty-one points
of error Greeley appeals his conviction. We will affirm.


BACKGROUND


 Appellant Daniel Carl Greeley first met the victim, Bruce Becker, in May 1995. 
Becker approached Greeley on Sixth Street in Austin, Texas, and engaged Greeley in
conversation. The two spoke for twenty to thirty minutes as they walked along the street. A
week later Becker approached Greeley on Guadalupe Street (the "Drag"), and the two conversed
briefly. Becker invited Greeley, who was living out of his car, to come to Becker's home. 
Greeley accepted and ended up spending the night. Greeley testified that the evening was
uneventful. The next morning Becker returned Greeley to his car. That night Becker saw Greeley
at an Austin night club and invited him to spend the night. Greeley accepted. Greeley testified
that between three and four o'clock the next morning he awoke to the sounds of Becker slamming
kitchen cupboards. Greeley stated that Becker was drunk and crying about an ex-boyfriend and
came into the room where Greeley was sleeping on the couch. Becker then removed all of his
clothing and lay down nude in the middle of the floor. Greeley said that the situation made him
uncomfortable and that he left the house and walked back to downtown Austin.

 Greeley testified that he had no further contact with Becker until May or June 1996,
when the two saw each other in the cafeteria of the Internal Revenue Service (IRS). Becker had
been employed at the IRS for a number of years, and Greeley was working there temporarily. 
Becker engaged Greeley in conversation, gave Greeley his telephone number and address, and
invited Greeley to his home to stay or do laundry. Greeley, who was living on the streets, went
to Becker's house and did laundry once in June. Greeley testified that he called Becker again on
July 13, 1996, and asked if he could come over to do laundry and get out of the heat. A third
man was also present at Becker's house, and the three stayed up all night. Greeley testified that
he was aware that Becker was homosexual and that at one point in the evening Becker put his arm
on Greeley. Greeley said that the action caused him to be in "a little bit of shock" but that
Greeley did not interpret Becker's action to be a sexual overture. 

 The next day Becker dropped the third man off in downtown Austin and invited
Greeley to return to Becker's house. Greeley testified that he accepted the offer because he
wanted to see a movie Becker was going to rent but that they had an understanding Greeley would
not be spending the night. The two men went to the Central Market grocery store to get food for
dinner and ran into Becker's co-worker. The co-worker identified Greeley in a photographic
lineup and at trial, testifying that she had been struck by the "expressionless" look on Greeley's
face. After leaving Central Market, the two men rented the movie and returned to Becker's home. 
Greeley testified that Becker was drinking bourbon and that the two sat together on the sofa, ate
dinner, and watched television. Greeley stated that Becker began massaging Greeley's neck and
suggested that the two go up to bed. 

 The evidence regarding what happened next is sharply conflicting. Three witnesses 
testified as to what Greeley related to them and presented the jury with four different versions of
events. In addition, Greeley testified and presented the jury with a fifth version. (1) Although the
stories vary in detail, by all accounts Greeley bludgeoned Becker repeatedly in the head with a
metal bar and stabbed him in the neck with a knife, killing him.

 Greeley then took Becker's keys out of his pocket, put Becker's body into a
footlocker, and attempted to clean up the room. Greeley drove to the Drag in Becker's car and
found Johnny Ooten, a man he had met while living on the streets. Greeley told Ooten that he
had killed Becker, and the two returned to Becker's house and made further attempts to remove
evidence. Greeley asked Ooten to help clean up the house and gave Ooten cleaning solution and
towels that Ooten used to clean the banister, the upstairs, and the bathroom. The two men put
the footlocker containing Becker's body in the trunk of Becker's car and loaded several boxes of
Becker's belongings and a small safe (2) into the vehicle. Greeley gave Ooten one of Becker's credit
cards and a personal identification number, and they drove to an Albertson's grocery store where
Ooten attempted to get money using the card. (3) After that attempt failed, the two drove to the
Drag, where Ooten made three additional attempts to use the card. At some point, Greeley gave
Ooten a shoe box containing baseball cards they had taken from Becker's house and drove to a
shop on the Drag where Ooten sold the cards and gave the money to Greeley. 

 Greeley and Ooten then drove to the Texas panhandle and buried Becker's body
and some of his personal items near a picnic area or rest stop. After burying the body, the two
men went to a local Wal-Mart where Ooten made yet another attempt to use one of Becker's credit
cards. Ooten testified that at some point after removing the body, Greeley emptied the car's
trunk, removed the trunk's liner, stabbed holes in the bottom of the trunk with a screwdriver, and
sprayed the trunk out with water. Ooten testified that the two men had originally planned to leave
the state but instead decided to return to Austin. 

 A few days after Greeley's and Ooten's return, an Austin police officer approached
Ooten on the Drag and asked him to come to the station and answer some questions. Ooten
agreed and was interviewed for several hours. The interview, which was videotaped, produced
two somewhat contradictory written statements, neither of which is in evidence. (4) The police flew
with Ooten to Amarillo and from there drove to the rest stop where the men had buried Becker's
body. 

 After leaving Ooten in Austin, Greeley made his way to Utah where he had lived
in early 1996. Keith Lee was living with Greeley's former roommate, Karra Urry, in Utah. Lee
testified that Greeley arrived at the Utah apartment on or about July 20. Lee, Urry, and Greeley
all indicated in their testimony that while staying at the apartment, Greeley used Becker's credit
cards to buy things that he would then sell. Lee testified that Greeley and Urry went to Texas in
late July or early August to get money. According to bank records, Greeley went to a Dallas bank
and cashed an eight-hundred-dollar check dated July 27, 1996, drawn on Becker's account and
payable to Greeley. 

 At the request of the Austin Police Department, Utah police kept surveillance on
the apartment where Greeley was staying with Lee and Urry. On or about August 1, while
Greeley and Urry were in Texas, Utah police officer Keith Stephens went to the apartment where
Lee admitted him. Lee gave Stephens permission to look around the common areas of the
apartment and Lee's bedroom. At that time Stephens saw a safe sitting on the patio of the
apartment. The safe matched the description of the one that Austin police had listed as missing
from Becker's house. Stephens obtained a search warrant for the apartment and executed it that
day or the day following. 

 In searching the Utah apartment, police found several items that were admitted at
trial, including two partially completed applications for a Utah identification card in the name of
Bruce Becker, copies of Becker's birth certificate, Becker's social security card, Becker's school
records and college degree, several of Becker's credit cards, a receipt from an Austin pawn shop
signed by Greeley, and a list in handwriting identified as Greeley's. (5) 

 Authorities arrested Greeley in Midvale, Utah and returned him to Austin where
he was indicted for both murder and capital murder. Greeley pleaded not guilty before a jury that
found him guilty of capital murder. Because the State did not seek the death penalty, Greeley was
automatically sentenced to life in prison. See Tex. Penal Code Ann. § 12.31(a) (West 1994); Tex.
Code Crim. Proc. Ann. art. 37.071, § 1 (West Supp. 2000). 


DISCUSSION


 In his first and second points of error, Greeley complains that the evidence is
legally and factually insufficient to prove he killed Becker in the course of robbing him. 


Sufficiency of the Evidence 

 To determine the legal sufficiency of the evidence to support a criminal conviction,
we view all the evidence in the light most favorable to the verdict and ask whether any rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 
See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Staley v. State, 887 S.W.2d 885, 888 (Tex.
Crim. App. 1994). We resolve any inconsistencies in the evidence in favor of the verdict. See
Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). This standard of review is the
same for both direct and circumstantial evidence. See Green v. State, 840 S.W.2d 394, 401 (Tex.
Crim. App. 1992). 

 When conducting a factual sufficiency review, we do not view the evidence in the
light most favorable to the verdict. Instead, we consider all evidence equally, including the
testimony of defense witnesses and the existence of alternative hypotheses. See Orona v. State,
836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). However, we do not substitute our
judgment for that of the jury and will set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. See Johnson v. State,
No. 1915-98, slip op. at 18 (Tex. Crim. App. Feb. 9, 2000); Clewis v. State, 922 S.W.2d 126,
129 (Tex. Crim. App. 1996). Furthermore, we may not reverse a jury's decision simply because
we disagree with the result. See Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

 Greeley specifically argues that the State failed to prove that he formed the intent
to steal before or concurrent with the murder. In support of his contention, Greeley cites us to
cases in which the State failed to disprove beyond a reasonable doubt an accused's claim that the
robbery was committed to conceal the murder. See Ibanez v. State, 749 S.W.2d 804 (Tex. Crim.
App. 1988); Palafox v. State, 608 S.W.2d 177 (Tex. Crim. App. 1979). However, in those cases
the State sought to use inculpatory portions of the accused's confession and was thus under a duty
to disprove exculpatory portions because of the now-abolished voucher rule. (6) See Russeau v.
State, 785 S.W.2d 387, 390 (Tex. Crim. App. 1990) (holding that voucher rule was rejected by
adoption of rule of evidence 607). Because this case does not involve the State using Greeley's
confession against him, the voucher rule would not apply even if it continued in existence, and
these cases offer no guidance.

 If the State introduces evidence from which the jury could rationally conclude that
the accused possessed the specific intent to obtain or maintain control of the victim's property
either before or during the commission of the murder, it has proven that the murder occurred in
the course of robbery even though the actual appropriation did not occur until after the murder. 
See Maldonado v. State, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999); Williams v. State, 937
S.W.2d 479, 483 (Tex. Crim. App. 1996); Robertson v. State, 871 S.W.2d 701, 705 (Tex. Crim.
App. 1993); Nelson v. State, 848 S.W.2d 126, 132 (Tex. Crim. App. 1992). Greeley contends
that the only evidence of a pre-existing intent is Ooten's testimony that Greeley told him prior to
the murder that Greeley was going to kill Becker because Greeley believed Becker had hurt
people. Greeley further contends that because Ooten testified Greeley did not say he intended to
rob Becker, there is no evidence establishing that intent. We disagree. The requisite intent may
be inferred from circumstantial evidence as well as from the defendant's conduct. See
Maldonado, 998 S.W.2d at 243; Wolfe v. State, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996);
Robertson, 871 S.W.2d at 705.

 This record contains ample evidence of Greeley's conduct from which the jury
could infer the requisite intent. Greeley admitted taking several items from Becker's home after
killing him. Ooten testified that when he and Greeley arrived at Becker's house to clean and
conceal the crime, Ooten found boxes Greeley had already packed with a number of Becker's
possessions, which the men loaded into the car for their use. After leaving Becker's house,
Greeley and Ooten made four attempts to use Becker's credit card to obtain cash and sold some
of Becker's property. Thereafter Greeley used Becker's credit cards to buy things to sell for
money while in Utah. Various witnesses testified that they received items from Greeley that were
later identified as having belonged to the victim. In addition, Greeley admitted having been in
Becker's bedroom before the night of the murder and having looked in Becker's closet where
Becker kept the safe. Ooten testified that the safe was already in the garage when he arrived, and
Utah police later seized this same safe from the apartment where Greeley stayed. 

 The record also contains evidence suggesting Greeley had a plan before the murder. 
Greeley was in financial difficulty and living on the streets at the time of the murder. Heather
Willard knew Greeley had been trying to find a way to quit living on the streets, and Greeley
admitted he thought he could use Becker for this purpose. Willard testified that Greeley drove
her by Becker's house in 1995 and spoke admiringly of Becker's wealth, property, and position. 
Willard also testified that Greeley spoke repeatedly and at length about assuming someone else's
identity. Evidence showed that Greeley had a book describing how to assume another person's
identity. The State offered into evidence partially completed applications for Utah identification
cards which contained Becker's personal information and Greeley's physical description. In
addition, Greeley admitted having written a list seized from the Utah apartment that says "safe
haven & supplies," "buy and pawn," "work under new identity," "make ID of Bruce," "get rid
of all objects," "leave no trace," "new identity Idaho/Montana," and "new life style." Greeley
admitted on cross-examination that, "It [the list] does look like a plan." 

 All evidence favorable to Greeley is controverted. Greeley claimed that he did not
form the intent to steal until after he killed Becker and only took things because they had blood
on them or because he wanted to pawn them to get money to leave Texas. However, the evidence
indicates that Greeley left several items, including books, that had blood on them and took items,
including the safe, that did not have blood on them. Greeley remained in Texas for a number of
days following the murder and returned to the state to cash a check in Dallas after he had gone
to Utah. Greeley claimed he did not notice Becker's safe in his closet until he searched the house
following the murder, but he admitted he had been in the bedroom and looked in the closet before
that day. Ooten testified that when Greeley brought him to the house, the safe was already in the
garage and some of Becker's things had already been packed in boxes. Greeley admitted that he
wrote the above-referenced list but claimed he did not do so until a week or more after the
murder; the list is undated. The decision on the relative weight to be given contradictory
testimony is within the sole province of the jury because it turns on an evaluation of credibility
and demeanor. See Cain, 958 S.W.2d at 408-09. A jury is free to believe or disbelieve all or any
part of any witness's testimony. See Moore v. State, 935 S.W.2d 124, 126 (Tex. Crim. App.
1996). Viewing the evidence in the light most favorable to the verdict, we hold that a rational
trier of fact could have concluded beyond a reasonable doubt that Greeley formed the intent to kill
Becker prior to or concurrent with the murder. See Williams, 937 S.W.2d at 483. Further, we
hold that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust. See Clewis, 922 S.W.2d at 129. We overrule Greeley's first and second points
of error. 


Ooten's Videotaped Statement

 In points of error three through six, Greeley contends that the trial court erred by
excluding the videotaped interrogation of Ooten. We review the trial court's decision to admit
or exclude evidence under an abuse of discretion standard. See Green v. State, 934 S.W.2d 92,
101-02 (Tex. Crim. App. 1996); Montgomery v. State, 810 S.W.2d 372, 379-80 (Tex. Crim.
App. 1990). Therefore, we will not reverse a trial court as long as its ruling is within the "zone
of reasonable disagreement." Green, 934 S.W.2d at 102; Montgomery, 810 S.W.2d at 391.

 In his third and fourth points of error, Greeley asserts that the trial court's
exclusion of the videotapes violated the sixth and fourteenth amendments of the United States
Constitution as well as sections ten, thirteen, and nineteen of article one of the Texas Constitution. 
In his sixth point of error Greeley claims that the trial court erred by overruling his motion for
new trial because of arguments made in points of error three through five. However, Greeley did
not urge his constitutional complaints in the trial court and has not preserved any such complaint
for review. Further, even if Greeley preserved error below, in his brief to this Court, he makes no
argument and cites no authority in support of these alleged errors and thus presents this Court with
nothing to review. See Tex. R. App. P. 38.1(h); Smith v. State, 907 S.W.2d 522, 531-32 (Tex.
Crim. App. 1995). We therefore overrule Greeley's third, fourth, and sixth points of error.

 In his fifth point of error, Greeley argues that because the videotapes were
necessary to place Ooten's testimony in proper context, the trial court erred in excluding them. 
Greeley was given unlimited opportunity to cross-examine Ooten. Greeley was able to elicit that
the police subjected Ooten to hours of interrogation and that Ooten told many different stories
verbally and in writing in the course of the interrogation. Although it is difficult to ascertain from
his brief, Greeley seems to argue that he nevertheless has some additional right to admit the
videotapes under a sort of "best evidence" argument because only those tapes could establish their
content and context to his satisfaction. However, Greeley does not make a "best evidence" claim
under rule 1002 (7), nor did he make such an argument below. Instead Greeley claims that other
rules allow him to admit the tapes to show the context in which Ooten gave his statement. 
Specifically, Greeley argues that: (1) the State opened the door by admitting parts of Ooten's
statement and rule 107 (8) required that the defense be allowed to put those parts in context,
(2) former criminal evidence rule 610(b) allowed for wide latitude in establishing a witness's
credibility, (9) (3) the court abused its discretion in excluding the statement under rule 403 because
there was no showing of undue delay, (10) and (4) the exclusion of the evidence harmed Greeley. 
The State responds by arguing that Greeley did not make these arguments to the trial court and
has therefore waived them. See Tex. R. App. P. 33.1 (requiring that complaint state sufficiently
specific grounds to bring alleged error to trial court's attention). Although Greeley's trial counsel
did not cite specific rules in offering the videotapes, we will address this point of error to the
extent that it corresponds to specific arguments Greeley made below.

 Greeley's first argument contends that under rule 107, popularly known as the rule
of optional completeness, he should have been allowed to introduce the videotapes to place into
context portions of Ooten's statement that were introduced by the State. Rule 107 reads in
pertinent part: "When part of [a] . . . writing or recorded statement is given in evidence by one
party, the whole on the same subject may be inquired into by the other." Tex R. Evid. 107
(emphasis added). 

 Evidence that is used to fully explain a matter opened up by the other party need
not be otherwise admissible. See Parr v. State, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977). 
However, the evidence offered for context must be "on the same subject" as the portion already
admitted. See Tex. R. Evid. 107; Jernigan v. State, 589 S.W.2d 681, 694-95 (Tex. Crim. App.
1979); Roman v. State, 503 S.W.2d 252, 253 (Tex. Crim. App. 1974). 

 Greeley made two separate attempts to offer the videotapes at trial, urging that the
tapes showing Ooten's interrogation were necessary to place Ooten's testimony in context. 
During the first discussion of the tapes, Greeley's counsel stated he "probably [would not] show
all of it" and "I don't want to show all of it." However, Greeley's counsel did not state the
specific portions he sought to admit. And in making his second offer at the close of Greeley's
defense, Greeley's trial counsel sought to admit the tapes without qualification. The tapes contain
information that is not on the same subject as Ooten's testimony--i.e., the murder of Bruce Becker. 
Because Greeley's offer was not limited to evidence admissible under rule 107, we cannot say that
the trial court abused its discretion in refusing to admit the tapes under rule 107. (11) 

 In his second argument on this point, Greeley contends that the trial court erred in
refusing to admit the tapes because they relate to Ooten's credibility and were admissible under
former criminal evidence rule 610(b), which stated, "A witness can be cross-examined on any
matter relevant to any issue in the case, including credibility." (12) Because rule 610(b) concerned
the scope of cross-examination and Greeley is not urging this complaint, we fail to see the
relevance of this rule. Greeley also contends that under rule 610, "[w]ide latitude should be given
on credibility," relying on Gonzales v. State, 929 S.W.2d 546 (Tex. App.--Austin 1996, no pet.). 
On the contrary, Gonzales discusses criminal evidence rules 608, 609, and 612, but not rule 610. 
Thus, the authorities Greeley cites do not support his proposition. (13)

 In his third argument, Greeley contends that the trial court abused its discretion by
excluding the tapes under rule 403 because their probative value was not outweighed by undue
delay. See Tex. R. Evid. 403. The total running time of the two tapes is over eight hours. As
noted above, Greeley ultimately sought to admit the tapes in their entirety although he stated that
he did not want to show them and only wanted the jury to have them available. 

 Assuming without deciding that Greeley's request to admit but not show the tapes
could preserve error, we evaluate whether Greeley presented the trial court with a viable reason
for admitting the tapes. Greeley offered the trial court several arguments as to why the videotapes
were admissible. In his initial offer, Greeley contended that the video was admissible as
impeachment, as a prior inconsistent statement, as probative of Ooten's credibility, and to
establish the context in which the statements were made. In discussing Greeley's second offer,
the trial court pointed out that Ooten admitted that his story had changed repeatedly. In response,
Greeley stated twice that he was not offering the tapes as impeachment and thus waived any
argument that the tapes were admissible on that basis. Greeley's offer also failed to establish the
tapes' admissibility as prior inconsistent statements because Ooten had admitted every
inconsistency about which Greeley inquired. See Tex. R. Evid. 613 ("If the witness
unequivocally admits having made [inconsistent] statements, extrinsic evidence of same shall not
be admitted."). In arguing that the tapes established the "context" of Ooten's testimony, Greeley
arguably invoked rule 107 and thus preserved the issue for appeal. But as noted above, this
argument fails because the offer was not restricted to portions of the tape on the same subject. 
Finally, because the trial court afforded Greeley extensive cross-examination to establish the
circumstances of the interrogation and the fact that Ooten had changed his story, admission of the
tapes would have been cumulative. Thus, we hold that the trial court did not act outside the "zone
of reasonable disagreement" in excluding the videotapes under rule 403. Because Greeley has
failed to show that the trial court abused its discretion by excluding the tapes, we need not address
whether the exclusion harmed him. We overrule Greeley's fifth point of error.


Manslaughter charge 

 In his seventh point of error, Greeley complains that the trial court erred by
refusing his requested jury charge on involuntary manslaughter. Involuntary manslaughter ceased
being a separate offense in 1994. See Acts 1993, 73d Leg., ch. 900, § 1.01, eff. Sept. 1, 1994. 
The court could not err in failing to charge an offense no longer in the Penal Code. Current law
prohibits the offense of manslaughter, defined as a reckless killing and the equivalent of
involuntary manslaughter under prior law. See Tex. Penal Code Ann. § 19.04 (West 1994). 

 Two factors must be considered in deciding whether Greeley was entitled to a
submission on the lesser included offense of manslaughter. First, the lesser offense
(manslaughter) must be included within the greater charged offense (capital murder). Second,
there must be some evidence that would permit a rational jury to find that, if the defendant is
guilty, he is guilty only of the lesser included offense. See Rousseau v. State, 855 S.W.2d 666,
672-73 (Tex. Crim. App. 1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981). 
An issue whether the defendant is guilty only of a lesser included offense is raised if there is more
than a scintilla of evidence that affirmatively rebuts or negates an element of the greater offense,
or if the evidence is subject to different interpretations, one of which rebuts or negates the crucial
element. See Schweinle v. State, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996); Saunders v. State,
840 S.W.2d 390, 391-92 (Tex. Crim. App. 1992). In determining whether appellant was entitled
to a charge on a lesser included offense, we view the evidence in the light most favorable to
appellant. See Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999) (accused entitled to
instruction on defensive issue even if evidence raising issue is weak and controverted).

 Manslaughter is a lesser included offense of capital murder. See Lugo v. State, 667
S.W.2d 144, 147 (Tex. Crim. App. 1984) (discussing involuntary manslaughter). Thus,
Greeley's argument satisfies the first prong of the Rousseau/Royster test. We must next determine
whether the record contains any evidence to indicate that if Greeley was guilty, he was guilty only
of manslaughter. 

 To prove capital murder, the State must prove a culpable mental state different than
that for manslaughter. Capital murder includes an intentional murder committed in the course of
a robbery. See Tex. Penal Code Ann. § 19.03(a)(2); Fuentes v. State, 991 S.W.2d 267, 272
(Tex. Crim. App. 1999). Manslaughter occurs when a person recklessly causes the death of an
individual. See Tex. Penal Code Ann. § 19.04; Ervin v. State, 991 S.W.2d 804, 806 (Tex. Crim.
App. 1999). 

 At issue here is whether there is any evidence showing that, if Greeley was guilty,
he acted only recklessly. "[R]eckless conduct involves conscious risk creation, that is, the actor
is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that
risk. At the heart of reckless conduct is conscious disregard of the risk created by the actor's
conduct." See Montoya v. State, 744 S.W.2d 15, 29 (Tex. Crim. App. 1987), overruled on other
grounds, Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

 Greeley points to evidence in the record that he contends shows that he acted only
recklessly in causing Becker's death. Greeley relies on character testimony that he was not a
violent person as well as testimony and physical evidence indicating that the killing was preceded
by a struggle. Greeley also relies on his testimony that: (1) he denied telling Ooten he planned
to kill Becker, (2) he did not go to Becker's house with the intent to rob or kill Becker,
(3) "Everything happened so fast," (4) he could not "believe this had happened," (5) he "did not
mean to" kill Becker, (6) he and Becker were struggling prior to the stabbing and Greeley thought
Becker "was going to come up and grab" him. Greeley claims he wrestled control of the metal
bar from Becker, (14) and the evidence shows that Greeley hit Becker in the head ten or eleven times
and stabbed Becker twice in the neck, severing his jugular vein. While this evidence might negate
Greeley's intent or raise the issue of negligence, it does not imply that Greeley consciously
disregarded a known risk. "If a defendant either presents evidence that he committed no offense
or presents no evidence, and there is no evidence otherwise showing he is guilty only of a lesser
included offense, then a charge on a lesser included offense is not required." Bignall v. State, 887
S.W.2d 21, 24 (Tex. Crim. App. 1994) (internal citation omitted). The record in this case
contains no evidence that, if believed, shows that if the defendant is guilty, he is guilty of only
the lesser offense on which he requested instruction. See Jones v. State, 984 S.W.2d 254, 257
(Tex. Crim. App. 1998). At best this evidence supports Greeley's contention that he acted in self-defense. (15) Self-defense was submitted to the jury and was rejected by them. We have reviewed
the evidence in the record in the light most favorable to appellant and find no evidence that
Greeley was acting with a conscious disregard of the risk created by his actions. Because the
evidence does not raise an issue that Greeley's conduct was reckless, the trial court did not err
in refusing to submit a charge on manslaughter. 


Sudden Passion

 In his eighth point of error, Greeley contends that the trial court erred by
discharging the jury without holding a punishment hearing at which Greeley could have adduced
evidence of sudden passion. Greeley cites former Penal Code section 19.04(d), repealed before
this offense occurred. (16) Otherwise, Greeley makes no argument and cites no authority under this
point. We therefore overrule Greeley's eighth point of error. See Tex. R. App. P. 38.1(h); 
Smith, 907 S.W.2d at 531-32. When an accused is found guilty of capital murder and the State
does not seek the death penalty, the law provides that the defendant's punishment must be assessed
at life in prison and no punishment hearing is required. See Tex. Code Crim. Proc. Ann. art.
37.071 (West Supp. 2000). 

 In points of error nine through twenty-two, (17) Greeley argues that he was deprived
of an opportunity to prove he acted out of sudden passion in violation of the fifth, eighth, and
fourteenth amendments of the United States Constitution and sections three, ten, thirteen, and
nineteen of article one and section one of article two of the Texas Constitution. Although the trial
court understood Greeley to be challenging the constitutionality of the statutory scheme, Greeley
did not raise specific claims at trial and thus failed to preserve error properly. See Tex. R. App.
P. 33.1(a)(1)(A). Further, he did not brief his Texas constitutional complaints separately and has
thus waived those complaints. In the event these errors were preserved, we will address them.

 "Sudden passion" is a defense that may be raised at the punishment stage of a
murder trial that, if proved, reduces the offense of murder to a second-degree felony. See Tex.
Penal Code Ann. § 19.02(d) (West 1994). Greeley contends the Texas capital murder scheme is
unconstitutional insofar as it results in an automatic life sentence following conviction in cases in
which the State does not seek the death penalty because it deprives an accused of the opportunity
to adduce evidence of sudden passion. See id. § 12.31(a); Tex. Code Crim. Proc. Ann. art.
37.071, § 1. Specifically, Greeley argues in relation to automatic sentencing that: (1) "[b]y
precluding [the accused's] raising and the jury's considering lesser culpability entirely, the statute
violates federal and Texas due process" (emphasis in original); (2) the statute violates
constitutional prohibitions against cruel and unusual punishment because it subjects a person with
lesser culpability to the same punishment as someone more culpable; (3) the statutory scheme
violates equal protection and is unconstitutionally vague because it gives prosecutors "near [sic]
complete discretion to waive the death penalty"; and (4) by providing for automatic sentencing,
the legislature invades the province of the courts in violation of the doctrine of separation of
powers. See U.S. Const. amends. V, VIII, XIV; Tex. Const. art. I, §§ 10, 13, 19. 

 Greeley seems to contend that the statute violates due process, equal protection, and
the prohibition against cruel and unusual punishment because the State has discretion on what
crime to charge. Greeley argues that an accused who commits an intentional murder in the course
of a robbery but who acts from sudden passion can properly be charged with felony murder or
with capital murder. Depending on which crime the State charges, the accused is subject to vastly
disparate punishments since murder reduced by sudden passion is only a second-degree felony
punishable by a maximum of twenty years whereas capital murder is a capital offense. Thus,
Greeley argues, the legislature has given the State unfettered discretion to punish two persons with
the same degree of culpability to very disparate degrees in violation of due process, equal
protection, and the prohibition against cruel and unusual punishment. 

 Despite a faulty premise, Greeley's basic argument seems to be that giving the State
discretion regarding what crime to charge violates constitutional protections because it allows the
State to treat similarly situated individuals differently. The authority to define crimes and
prescribe their punishments is vested in the legislature. See Ex parte Granviel, 561 S.W.2d 503,
515 (Tex. Crim. App. 1978). The executive branch is charged with enforcing the laws as adopted
by the legislature. In enforcing these laws and deciding what crime to charge, the State has
prosecutorial discretion. See Gregg v. Georgia, 428 U.S. 153, 199 (1975) (plurality opinion). 
In exercising its discretion based on the strength of its case, the State is limited by cognizable
standards. See Gregg, 428 U.S. at 225-26 (White, J. concurring); Fearance v. State, 620 S.W.2d
577, 581 (Tex. Crim. App. 1980). We reject Greeley's argument that the statutory scheme and
the attendant prosecutorial discretion are unconstitutional. 

 Greeley's remaining claims likewise have no merit. This Court has previously
ruled that shifting the burden to prove sudden passion to the accused does not violate the state or
federal constitution. See Robinson v. State, 945 S.W.2d 336, 341-43 (Tex. App.--Austin 1997,
pet. ref'd). In addition, it is well settled that the discretion afforded the State on whether to seek
the death penalty does not violate the constitution or the separation of powers doctrine. See Cantu
v. State, 842 S.W.2d 667, 692 (Tex. Crim. App. 1992); Barefield v. State, 784 S.W.2d 38, 46
(Tex. Crim. App. 1989). Further, the Supreme Court has held that a sentencing scheme that calls
for an automatic sentence of life imprisonment, rather than an individualized punishment
determination, does not violate the Eighth Amendment guarantee against cruel and unusual
punishments. See Harmelin v. Michigan, 501 U.S. 957, 995 (1991). (18) There is no significant
difference between the Eighth Amendment prohibition against cruel and unusual punishments and
the Texas Constitution's prohibition against cruel or unusual punishment. See Cantu v. State, 939
S.W.2d 627, 645 (Tex. Crim. App. 1997). Therefore Greeley's argument is without merit under
either constitution. Points of error nine through twenty-two are overruled.

 The judgment of conviction is affirmed.



 


 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel 

Affirmed

Filed: May 31, 2000

Do Not Publish
1. Four witnesses, including Greeley, testified at trial. Although Greeley was the only
person present when Becker was killed, the other witnesses testified regarding what Greeley told
them. Johnny Ooten testified at trial that Greeley told him that Greeley and Becker were
"hugging and their arms are wrapped around each other," Greeley tried to get up, the two men
"for some reason . . . wrestled onto the floor and [Becker] pulled a metal weight bar from
underneath the couch and [Greeley] took it from him, and from there began to hit him with it." 



 The State then read into evidence a portion of Ooten's statement to the police that said that
the two men were "sitting on the couch cuddling up," Becker tried to get up, and Greeley started
choking him. Greeley continued to choke Becker, and Becker wrestled Greeley to the ground and
pulled the weight bar out from under the couch and started hitting Greeley. Greeley took the
weight bar away from Becker and hit him with it. 


 Another witness testified that Greeley told him "he got in a fight and a man bit him and
it was self defense and the fight got out of hand." Greeley testified to a fourth version of events
in which Greeley tried to get up from the sofa, Becker started choking him, Greeley attempted to
flip Becker over him, and Becker bit him. The two men then struggled to the ground, and Becker
pulled out a steel weight bar and started hitting Greeley with it. Greeley and Becker struggled
for the bar, and Greeley hit Becker with it repeatedly, but all the while Becker continued to
struggle and did not let go of the bar. 


 A witness called by the defense testified to a fifth version of events in which Becker was
holding "an instrument" against Greeley's neck, the two men struggled "for quite a few hours,"
and Greeley wrapped his legs around Becker to keep Becker from trying to strangle him. 
According to this version, Greeley held Becker with his legs "for quite a long time" and the two
men struggled "for a long time." 
2. Ooten testified that the first time he saw the safe it was in the garage at Becker's house. 
Other testimony established that Becker kept the safe in a closet in his upstairs bedroom. 
3. It is unclear from the record how many of Becker's credit cards Greeley had at this time. 
Ooten first testified that Greeley took "them" (the credit cards) out of the glove compartment but
later stated that he saw only a single Discover Card in the car prior to the opening of the safe,
which contained Becker's wallet. 
4. Although not in the record before this Court, defense counsel contended on the record
that the two statements were contradictory. Although marked as State's exhibits, the State did not
offer the statements into evidence but read portions of them into the record after Ooten denied
having made certain allegations contained therein. Greeley did not request that the statements be
admitted to place the portions read by the State into context. See Tex. R. Evid. 107 (when one
party refers to portion of document or recording in examining witness, opposing party may
request admission of whole document or recording to place portion in context). 
5. The note pad containing the list was not admitted at trial. Although the list, which was
admitted, could not have been properly seized under a Texas search warrant, the State argued at
trial that Utah law allowed for its seizure. Greeley does not contest the admissiblity of the list on
appeal. 
6. Under the criminal version of the voucher rule, "when the State introduce[d] a
defendant's confession in evidence, it [was] bound by any exculpatory statements contained
therein unless such statements [were] disproved." Palafox v. State, 608 S.W.2d 177, 183 (Tex.
Crim. App. 1979) (Dally, J. dissenting).
7. See Tex. R. Evid. 1002. 
8. See Tex. R. Evid. 107. Greeley's case was subject to the former criminal evidence
rules, and he apparently is arguing under those rules. Because the new combined evidence rules
are not substantively different, we will refer to the current version of the rules unless otherwise
indicated. 
9. See Tex. R. Crim. Evid. 610 (1997).
10. See Tex. R. Evid. 403.
11. Because Greeley could have offered Ooten's written statements to place the admitted
portions in context, we also question whether the tapes meet the requirement of being necessary
under the rule. See Tex. R. Evid. 107.
12. Tex. R. Crim. Evid. 610 (1997). Greeley's brief refers only to "rule 610(b)." We can
only assume Greeley intended to refer to former criminal evidence rule 610(b) because the current
rule 610 does not have subsections and deals with religious beliefs or opinions. See Tex. R. Evid.
610. 
13. In one sentence under his heading "Credibility, Confrontation, Impeachment, Etc."
Greeley seems to suggest that the tape establishes Ooten was biased because he was coerced and
pressured into making his statement. As a general rule, wide latitude should be given to establish
a witness's bias. See Gonzales v. State, 929 S.W.2d 546, 549 (Tex. App.--Austin 1996, no pet.). 
However, Ooten freely admitted on both direct and cross-examination that he was "under a lot
of pressure." In addition, in offering the tapes Greeley never argued that they showed Ooten's
bias. We cannot say the trial court abused its discretion in not considering an argument that
Greeley failed to make.
14. Greeley testified that Becker continued to hold on to the bar during the entire struggle
even after being bludgeoned repeatedly.
15. Greeley's testimony regarding self-defense was itself controverted. Ooten testified that
when Greeley first told him what had happened, Ooten told Greeley that it did not sound like self-defense to him. Urry testified that she had the impression that Greeley was covering up
something. 
16. See Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws
1122, 1123 (Tex. Penal Code Ann. § 19.04 repealed by Act of May 29, 1993, 73d Leg., R.S.,
ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3614, eff. Sept. 1, 1994.
17. Although Greeley's points of error are numbered one through twenty-two, his brief does
not contain an eighteenth point of error.
18. Although Harmelin produced several opinions, five justices joined this holding.



" 
2. Ooten testified that the first time he saw the safe it was in the garage at Becker's house. 
Other testimony established that Becker kept the safe in a closet in his upstairs bedroom. 
3. It is unclear from the record how many of Becker's credit cards Greeley had at this time. 
Ooten first testified that Greeley took "them" (the credit cards) out of the glove compartment but
later stated that he saw only a single Discover Card in the car prior to the opening of the safe,
which contained Becker's wallet. 
4. Although not in the record before this Court, defense counsel contended on the record
that the two statements were contradictory. Although marked as State's exhibits, the State did not
offer the statements into evidence but read portions of them into the record after Ooten denied
having made certain allegations contained therein. Greeley did not request that the statements be
admitted to place the portions read by the State into context. See Tex. R. Evid. 107 (when one
party refers to portion of document or recording in examining witness, opposing party may
request admission of whole document or recording to place portion in context). 
5. The note pad containing the list was not admitted at trial. Although the list, which was
admitted, could not have been properly seized under a Texas search warrant, the State argued at
trial that Utah law allowed for its seizure. Greeley does not contest the admissiblity of the list on
appeal. 
6. Under the criminal version of the voucher rule, "when the State introduce[d] a
defendant's confession in evidence, it [was] bound by any exculpatory statements containe