# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00654-CR

**Mark Allen Gatten, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 433RD DISTRICT COURT OF COMAL COUNTY
### NO. CR2021-459E, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

---

### **O P I N I O N**

A jury found appellant Mark Allen Gatten guilty of capital murder. *See* Tex. Penal Code § 19.03(a)(2). As required by law, the trial court sentenced Gatten to life imprisonment without parole. *See id.* § 12.31(a)(2). In two issues, Gatten challenges the sufficiency of the evidence (1) corroborating the accomplice witness's testimony and (2) supporting the jury's guilty finding. We affirm the trial court's judgment of conviction.

### BACKGROUND

In 1986, camper John Baxter discovered decomposing human remains bound with multiple ligatures in a tent in Jacob's Creek Park near Canyon Lake, Texas. The victim was later identified as Charles Hardin. Investigators, including former Comal County Sheriff's Deputy Dennis Koepp, collected evidence from the campsite but did not charge anyone in connection with

Hardin's death. In 2020, then-Texas Ranger[1] Joshua Ray reexamined the case and obtained capital-murder indictments against two suspects, Gatten and Tracey Loy. The State agreed to reduce Loy's charge to murder and recommend a sixty-year sentence in exchange for his testimony at Gatten's trial.

Baxter testified about the discovery of Hardin's body on August 26, 1986. On the third day of a camping trip with his wife, Baxter walked around fifty feet to a neighboring campsite after noticing that a dog, a boombox, and fishing gear had been left out in the rain. The campsite had already been set up when Baxter and his wife arrived, but in the intervening two days, they had not seen anyone there. On the 25th, however, Baxter had seen a mid-80s blue Chevrolet Celebrity drive down a trail next to the campsite; the trail, which "seemed like just two wagon tracks," was perpendicular to the main road. Baxter saw two men in the car's front seats. As the men passed Hardin's campsite, it appeared to Baxter that they were looking at it. The car stopped at the trailhead for an "extended period of time," and the driver glowered at Baxter before leaving.

When he entered the campsite on the 26th, Baxter asked the dog where his owner was. The dog sat down next to the tent flap. Baxter saw Hardin's "bloated and smelly" body inside the tent but did not remember how he was dressed or positioned. He and his wife drove to Canyon City, and Baxter reported the discovery to a justice of the peace.

Koepp, who in 1986 had been a licensed peace officer for two years, testified about the investigation of Hardin's death. Koepp observed that Hardin, who investigators identified from his fingerprints, appeared to have been dead "for some time"; that his ankles, thighs, wrists, and neck were bound with many ligatures; that those tied around his neck and wrists were

---

[1] At the time of trial, Ray was Chief Deputy with the Guadalupe County Sheriff's Office.

2

connected; and that there was a laceration on his forehead, from which blood had "soak[ed] through" surrounding items. Hardin's cause of death was determined to be homicide after an autopsy.

Koepp photographed and collected evidence from the scene. Hardin's tent was around eighty-one feet from a picnic table, on top of which investigators found a plastic Coke bottle, beer cans, and a pair of pants containing Loy's birth certificate. Underneath the table was a green wallet holding two paystubs that bore Gatten's name and Social Security number.[2] Eight feet in front of Hardin's tent, investigators located a suitcase packed with clothing, a plastic flute, a camera strap, and pages torn from an Atlanta phone book. Near Hardin's head, Koepp discovered a green metal ashtray, in which were a partially empty pack of Salem cigarettes and cigarette butts, and a camouflage hat with pins from various rock bands. In Hardin's shirt pocket, Koepp found a pack of Belair cigarettes, a pocket comb, and a disposable lighter. Also recovered from the tent were two pairs of men's briefs and a pack of Marlboro cigarettes. The Coke bottle, beer cans, pants, wallet, camouflage hat, suitcase and its contents, phone book pages, pocket contents, Marlboro cigarettes, and underwear were admitted into evidence at trial.[3] The green ashtray; Salem cigarettes pack; and cigarette butts, some of which were destroyed during DNA testing, were not admitted. Koepp did not recall seeing a boombox or fishing gear.

The 1986 investigation was limited. Koepp asked the Department of Public Safety to run Gatten's and Loy's names through a database containing driver's license and arrest records but testified that he was unable to follow up on the results. Koepp did not request outside

---

[2] Chief Deputy Ray testified that the number was in fact one digit off.

[3] Although the ligatures and a bandana wrapped around Hardin's neck were also collected, Chief Deputy Ray testified that they were lost at some point before trial.

3

assistance, interview witnesses, or attempt to locate the companies listed on the paystubs. He issued a press release and walked the campsite but did not see any tire tracks. Some of the evidence collected by officers was submitted for blood-type and fingerprint analyses.

The State retained Dr. Satish Chundru, a private forensic pathologist, to testify about Hardin's autopsy, which was performed in 1986 by the Travis County Medical Examiner's Office. Dr. Chundru testified that he had performed over 9,000 autopsies, including for Comal and other counties. In preparation to testify, he reviewed the autopsy report and photographs, a toxicology report, and an offense report written by law enforcement.

Dr. Chundru's independent opinion as to Hardin's cause of death was that he "died of an asphyxia strangulation component." The state of Hardin's body was consistent with his having been dead for several days. He had tight ligatures around his neck, wrists, and ankles; the ligatures around his neck and wrists were connected in a manner that Dr. Chundru described as akin to "hog-tying." Dr. Chundru concluded that Hardin could not have tied the knots in the ligatures himself. The doctor had attended lectures, conferences, and trainings where he learned "about the specific ways that people who engage in autoerotic asp[h]yxiation . . . tie knots or what sort of practices they use." According to Dr. Chundru, practitioners typically install a release mechanism, of which he saw no evidence. He noted that the knots were complex and tight; that Hardin's neck was distorted and his tongue protruding, indicating that the ligatures had been applied with great pressure; and that a number of ligatures had been tied. Hardin's neck alone was wrapped in three ligatures, including two strips of cloth torn from a sheet and a bandana loosely tied on the outside. Dr. Chundru testified that "to wrap three things around your own neck would be impossible" given that Hardin would have lost consciousness in approximately fifteen seconds.

4

Dr. Chundru likewise rejected the idea that someone else could have tied the ligatures with Hardin's consent as part of a sexual encounter. He testified that sexual asphyxiation involving more than one person in his experience takes the form of manual strangulation. Calling what happened to Hardin "pretty obvious," Dr. Chundru testified that "if you think it's anything else besides a homicide or murder, I can't—I can't say anything." Although there were no visible injuries to Hardin's hands, Dr. Chundru explained that "[i]t's very difficult in decomposed bodies to see bruising because of the discoloration." He added that it was "difficult to make out if there are injuries" to Hardin's hands or fingers. Despite agreeing that he could not know whether Hardin had consented to being tied up, Dr. Chundru testified on cross-examination that the intent to cause Hardin's death could be inferred from the nature of the restraints and manner of death.

Dr. Chundru clarified that the toxicology report, which indicated that Hardin's blood-alcohol content was .25 grams of alcohol per deciliter of blood, was of little value in this case because a decomposing body produces "up to .1, .15 [g/dL] postmortem." Thus, he estimated that Hardin "had some alcohol but not .25 for sure, at least maybe half or less."

Abigail Bender and Melissa Pemberton, DPS forensic scientists, testified about DNA testing performed on evidence after the case was reopened in 2020. Pemberton tested swabs from three beer cans taken from the picnic table as well as cuttings from the filters of two cigarette butts found in the green ashtray near Hardin's head. No DNA profiles were obtained from the beer can swabs, and no interpretable DNA profiles were obtained from the cuttings from one of the butts. Pemberton testified that the latter meant that there was DNA present on the cuttings but not enough for her to determine confidently how many people had contributed to it. Analysis of a cutting from the other cigarette butt, however, resulted in a partial DNA profile originating from a

single male.[4]  Pemberton compared the profile against known reference samples from Hardin, Gatten, and Loy and testified that "the probability of this profile, if the DNA came from Mark Allen Gatten, is 6.9 thousand times greater than the probability of the profile if the DNA came from an unrelated, unknown individual." The result indicated "support for the proposition or scenario that Mark Allen Gatten is a possible contributor of the profile." Her report stated, "Charles Hardin and Tracey Keith Loy are excluded as the contributor of this profile."

Bryan Strong, a DPS forensic scientist specializing in fingerprint analysis, testified that he compared latent fingerprints observed on the Coke bottle recovered from the top of the picnic table to Gatten's fingerprints.  Strong testified that three of the four prints compared matched; the fourth was inconclusive owing to insufficient detail.

Loy's testimony is divisible into three parts.  During his first account of Hardin's death, Loy testified that he and Gatten met in Ohio and hitchhiked together to Austin, Texas.  While at a gay bar, they met Hardin, who invited them to drink beer at his campsite at Canyon Lake.  The three men drove to the campsite in Hardin's blue Chevrolet sedan.  At some point during the evening, Gatten came up with a plan to rob Hardin.  Hardin, Loy, and Gatten drank beer, and a sexual encounter occurred in Hardin's tent involving one or both of the other men.  The encounter did not involve bondage or tying up Hardin.  After the encounter, Gatten bound Hardin with ligatures and murdered him in the tent.  Loy and Gatten took Hardin's car without permission and drove to Colorado, where they were involved in an accident and parted ways.  On the way to Colorado, they bought black spray paint to disguise the car.

---

[4] No DNA profile was obtained from a larger second cutting from the same butt.

6

Loy admitted to having owned or "probably" owned various bandanas, the camouflage hat, the boombox and cassette tapes, the pants containing his birth certificate, and the men's underwear. He testified that he had smoked Marlboros but did not remember what kind of cigarettes Gatten and Hardin had smoked. Loy also testified that he had used ropes and cords to tie down his belongings but did not believe he had owned any sheets or blankets.

Although these facts were uncontradicted or remained consistent, Loy's testimony frequently changed regarding the nature of the sexual encounter and whether Gatten had participated. Loy also equivocated as to when and how many times he and Gatten discussed the robbery, whether Loy accompanied Hardin to purchase the beer, what if anything was stolen besides Hardin's vehicle, when Gatten entered the tent, how much of the murder Loy witnessed, and whether Gatten had used a knife during the murder.

In the second part of Loy's testimony, which occurred during cross-examination on the third day of trial, he seemingly recanted much of his first account:

> Q. And the truth of the matter is that you were involved in sexual activity when you were intoxicated or had been drinking, using ligatures and something went terribly wrong. Isn't that the truth? Just say it, Mr. Loy, if it's the truth. Isn't it the truth?
>
> A. Yes.
>
> . . . .
>
> Q. So you would agree with me, Mr. Loy, that once that happened, that it probably panicked you and made you scared, didn't it?
>
> A. Yes.
>
> Q. And you would agree with me that that's why you left a lot of things that were personal to you at that campsite, wouldn't you?
>
> A. Yes.
>
> Q. And that's why you left your underwear in the tent and just took off?

7

A. Yes.

. . . .

Q. And the reason that you were unwilling to say the truth until now is because you didn't want anybody to know—

A. Yes. Sorry.

Q. You didn't want anybody to know you were engaging in that type of sexual activity. Isn't that right?

A. Yes.

Q. So when everything went wrong, you decided it was time to go. You told Mark Gatten, ["H]e shit himself, let's go,["] didn't you?

A. Yes.

Q. And it was never about robbery. It was never about stealing anything from this man. It was about having sex with a stranger and it went terribly, terribly wrong. Isn't that the truth?

A. Yes.

Q. Look at me. Look at them. Is that—is that what happened? I saw you crying when you were talking about the pictures and I'm sure you remember them. I mean, I'm not going to make you look at them again. But you look at that jury and you tell them that's what happened.

A. That's what happened.

Q. Has that been hard for you to say?

A. You don't even know it.

Q. And when you went along and told the ranger all of this stuff, was it just because you wanted to get yourself out of trouble and you figured that was the easiest way to do it?

A. Yes.

Q. And when you went along with taking this deal to come in here and tell this story about Mark Gatten, you figured that that was just the easiest way to get through everything?

A. Yes.

However, under questioning by the State immediately following his apparent recantation, Loy reaffirmed that Gatten had bound and murdered Hardin:

Q. Mr. Loy, are you tired of the defense attorney asking you questions?

A. Yes.

Q. Are you just agreeing with whatever she says because you want her to stop?

A. Yes.

Q. Okay. Did you, in fact—were you the one who strangled Charles Hardin?

A. No.

Q. Was it part of some sex game?

A. Yes.

Q. Okay. Who did it then?

A. It wasn't me.

Q. Okay. If it wasn't you, did Charles Hardin strangle himself?

A. No.

Q. Who else was in the tent?

A. Mark Gatten.

Q. Okay. You testified earlier that you didn't know Mark was going to kill him. Is that because you knew he didn't want to kill him or you didn't know Mark was going to kill him?

A. He didn't tell me he was going to kill him.

Loy testified that after Gatten murdered Hardin, Gatten and Loy took Hardin's car and money.

Chief Deputy Ray testified about two interviews he conducted with Loy and two he conducted with Gatten; an audio recording of the first Loy interview and video recordings of

9

the remaining three interviews were admitted into evidence at trial. Ray testified that during Gatten's first interview, he repeatedly denied having ever been to Texas, claimed not to know Loy or the identity of a woman whose photograph was found in the green wallet, and admitted that his Social Security number was on the paystubs found in the wallet. Ray testified that Gatten refused to provide a DNA sample and terminated the interview and that, in contrast, Loy confessed during his first interview to his part in Hardin's death.

As seen in the video recording of Gatten's first interview, he also refused to provide a handwriting sample, accusing Ray of "trying to get [him] on something." Gatten denied owning the wallet or recognizing the company on one of the paystubs; claimed to have memory problems; and when asked if his fingerprints or DNA would be discovered on Hardin's tent, answered, "I don't know."

Ray testified that during Gatten's second interview, he admitted to being at the campsite but maintained that he had not gone into the tent; Gatten also admitted that the green wallet found under the picnic table was his. Ray testified that according to Gatten, Hardin picked him and Loy up from the side of a highway in Florida and drove them around two hours to the campsite.[5] Ray further testified that Gatten had mentioned nothing about "a bondage sex game gone wrong" but instead seemed to suggest that Loy had intentionally killed Hardin.

Gatten also told Ray that he took a nap in Hardin's car while at the campsite and that when he woke up, Loy suggested they go to the store. At the store, Loy confessed to murdering Hardin, causing Gatten to "pound[] on the fucking steering wheel." Asked for a reason for the killing, Loy replied, "Why not?" Gatten told Ray, "Loy tells me to go straight," and the two men

---

[5] Gatten attributes this discrepancy to his being "geographically challenged."

10

eventually drove to Colorado. From Gatten's statement regarding the steering wheel, Ray testified that Gatten had driven Hardin's car after the murder.

The jury found Gatten guilty of capital murder, and the trial court sentenced him to mandatory life imprisonment without parole. This appeal followed.

## DISCUSSION

### I. Accomplice Witness Testimony

In his first issue, Gatten contends that there was insufficient evidence to corroborate Loy's accomplice witness testimony. Gatten argues that excluding Loy's testimony, the evidence at most showed that Gatten was present at the campsite and exhibited consciousness of guilt about "***some wrongdoing* in Texas**." He also argues that there was no evidence that he robbed Hardin. Gatten further argues that our sufficiency analysis must conform to the Court of Criminal Appeals' decision in *Coston v. State*, 287 S.W.2d 671 (Tex. Crim. App. 1956). According to Gatten, the Court held that when an accomplice at trial recants initial, inculpatory testimony, "it is the *final* version that must be corroborated."

"An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. art. 38.14.

The test for sufficient corroboration is whether rational jurors could conclude that the combined, cumulative weight of the inculpatory non-accomplice evidence tends to connect the

11

defendant to the commission of the charged offense. *See Smith*, 332 S.W.3d at 442; *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). The rule is not based on federal or state notions of sufficiency; "there simply needs to be 'other' evidence tending to connect the defendant to the offense." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). It is "not a high threshold," *Lymbery v. State*, 686 S.W.3d 466, 475–76 (Tex. App.—Tyler 2024, pet. ref'd), and the corroborating evidence need not "directly link the accused to the crime," *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993), alone establish the defendant's guilt beyond a reasonable doubt, *id.*, or corroborate "each element of the offense charged or . . . each aspect of the accomplice's testimony," *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016). Even "apparently insignificant" circumstances may constitute sufficient evidence of corroboration. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). However, the evidence must do more than merely "point the finger of suspicion towards an accused." *Castaneda v. State*, 682 S.W.2d 535, 538 (Tex. Crim. App. 1984). In making our determination, we view the evidence in the light most favorable to the jury's verdict and must not "independently construe the non-accomplice evidence" or supplant the verdict with our own view of the evidence, which may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442.

The Court of Criminal Appeals has recognized that certain evidence is by itself insufficient to corroborate an accomplice witness's testimony but may be sufficient when considered in connection with other evidence tending to connect the defendant to the offense. Such evidence includes: the fact that an offense was committed, *id.* at 439; motive and opportunity, *id.* at 442; presence at or near the crime scene around the time of the offense, *id.* at 442–43; presence in the accomplice's company around the time of the offense, *Nelson v. State*, 542 S.W.2d 175, 177

(Tex. Crim. App. 1976); failure to report the offense to police, *Cox v. State*, 830 S.W.2d 609, 612 (Tex. Crim. App. 1992); and consciousness of guilt, including suspicious behavior, *Smith*, 332 S.W.3d at 445, secretive actions, *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994), flight, *Cruz v. State*, 690 S.W.2d 246, 250 (Tex. Crim. App. 1985), or possession of the fruits of the crime, *Paulus v. State*, 633 S.W.2d 827, 835–36 (Tex. Crim. App. 1981). Indeed, the Court has found sufficient corroboration from presence at or near the crime scene coupled with "subsequent flight; unseasonableness of the hour, without reasonable explanation therefor or lack of apparent reason for such presence; and possession of fruits or instrumentalities of the crime." *Id.* When, as here, a defendant is charged with capital murder under subsection 19.03(a)(2), the Court has held that "a defendant's presence at the scene and participation in the underlying offense [is] sufficient to connect him to the capital murder for accomplice-witness rule purposes." *Solomon*, 49 S.W.3d at 362.

The jury in this case was presented with non-accomplice evidence from which it could have reasonably inferred that a murder and robbery occurred; that Gatten had mean, motive, and opportunity to commit both offenses; that at or near the time of the offense, he was in Loy's company and present not only at the campsite but inside the tent; that he failed to report the murder until questioned a second time by Chief Deputy Ray; and that following the murder, Gatten drove Hardin's car and exhibited consciousness of guilt, including by fleeing to Colorado and repeatedly lying to Ray.

The evidence showed that Gatten had opportunity through his admissions that he was present at the campsite during the murder and that he left the area in Hardin's car. He also admitted to being in Loy's company during the commission of the offenses. Moreover, Gatten's wallet was found under the picnic table. His fingerprints were found on a Coke bottle on the table.

13

And his DNA was obtained from a cigarette butt in an ashtray near Hardin's head. A rational juror could have found a motive for the murder in the theft of Hardin's car.

Gatten argues that the evidence shows only that he was a passenger in the car and therefore did not participate in the robbery. We disagree. In his second interview, Gatten told Ray that Loy had given him directions as he drove away from the store, including "tell[ing] me to go straight." From this statement, and from Gatten's statement that he pounded the steering wheel, a reasonable juror could have inferred that Gatten had driven Hardin's car after murdering him and when Gatten and Loy drove to Colorado. Were the juror to disbelieve Gatten's claim that they left for Colorado the same day as Hardin's murder, the juror could also have inferred that Gatten had been one of the two men seen by Baxter in Hardin's car looking into Hardin's campsite at least two days after the murder—behavior that is both suspicious and secretive.

Because the jury could have reasonably concluded that Gatten had been present for the murder and had participated in the robbery, there was sufficient corroborating evidence to connect him to the capital murder. *See id.* Yet in addition to the above evidence, Gatten repeatedly lied during his interviews. During the first interview, he denied ever having been to Texas, knowing Loy, or owning the green wallet. He also denied recognizing the company on the paystub inside the wallet and claimed that his uncle had gone on the run and had used Gatten's name. Asked whether his DNA or fingerprints would be discovered on Hardin's tent, Gatten replied, "I don't know." A rational juror could have reasonably inferred that Gatten also lied during his second interview when he told Ray that Hardin—whose driver's license was admitted into evidence and gave a Houston address—had promised to drive him back to Ohio because Gatten wanted to be rid of Loy.

14

From this record, when viewed in the light most favorable to the jury's verdict, we conclude that rational jurors could have found that the combined, cumulative weight of the inculpatory non-accomplice evidence tended to connect Gatten to the commission of the capital murder. *See Smith*, 332 S.W.3d at 442; *McDuff v. State*, 939 S.W.2d 607, 612 (Tex. Crim. App. 1997); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

We do not agree with Gatten that *Coston* compels a different conclusion. That case involved a burglary trial at which "[t]he State was handicapped by having to make out its case by a recanting accomplice witness who had a long history of felony convictions." 287 S.W.2d at 671. The accomplice witness first testified that the defendant had been a principal to the burglary but later "repudiated a great portion of his former testimony." *Id.* "The only incriminating testimony of the accomplice witness that remained after he finished recanting was that the [defendant] came from Dallas with him, waited in the automobile while he (the accomplice witness) entered the building, and later drove him back to Dallas with the stolen property." *Id.*

Gatten focuses on the Court of Criminal Appeals' statement, "We must now determine whether this testimony which remained was sufficiently corroborated." *See id.* The Court explained:

> The State relies for corroboration upon evidence as to tracks. This evidence might be utilized to corroborate the accomplice's original testimony that appellant assisted in carrying the stolen goods from the building and thus connect the appellant with the commission of the burglary, but cannot serve to corroborate the accomplice's final testimony, which was that the appellant did not get out of the automobile at the scene of the burglary.

*Id.* at 672.

Gatten asserts that the *Coston* Court held that corroboration must be analyzed exclusively in terms of the testimony last given by a recanting accomplice witness, which he proposes in this case was Loy's recantation on cross-examination.

The present case is distinguishable such that even if Gatten's interpretation of *Coston*'s holding were valid, our conclusion would be the same. First, there was substantial incriminating evidence other than Loy's statements and testimony. Second, unlike the accomplice witness in *Coston*, Loy did not ultimately recant his incriminating testimony. On cross-examination, as Gatten emphasizes, Loy agreed that it was "never about robbery," but rather he had been "having sex with a stranger" and was "intoxicated or had been drinking, using ligatures and something went terribly wrong." He further agreed that his initial testimony and statements to Chief Deputy Ray had simply been the "easiest" thing to do to avoid "trouble."

However, Gatten is wrong to characterize that testimony as Loy's last. On redirect after the cross-examination, Loy agreed with the State that he was "tired of the defense attorney asking [him] questions" and was "just agreeing with whatever she says because [he] want[ed] her to stop." He then testified that he had not strangled Hardin, that Hardin had not strangled himself, and that Gatten had been the only other person in the tent. Loy testified that Gatten "didn't tell me he was going to kill him" and that after the murder, Gatten and Loy took Hardin's car and money. Even if this testimony alone were to be considered under article 38.14, we would conclude that there was sufficient non-accomplice corroborating evidence.

For these reasons, we overrule Gatten's first issue.

16

## II.    Sufficiency of the Evidence

In his second issue, Gatten contends that "[t]he evidence is insufficient to show [he] intentionally caused Hardin's death where the accomplice testified that the death occurred during a sex act gone wrong."  Specifically, Gatten asserts that there was no evidence that he intended to kill Hardin; that he, rather than Loy, killed Hardin; or that the murder was done to facilitate the theft of Hardin's car, which Gatten suggests was merely an unrelated afterthought.

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020).  In making this determination, we "consider all of the admitted evidence, regardless of whether it was properly admitted."  *Stahmann*, 602 S.W.3d at 577.  The factfinder "is the sole judge of credibility and weight to be attached to the testimony of the witnesses."  *Id.*  Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018).  The factfinder "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *Stahmann*, 602 S.W.3d at 577, and "may rely on common sense and apply observation and experience gained in ordinary affairs when drawing inferences from the evidence," *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).  "When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution."  *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018).

17

We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We must also bear in mind that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hammack v. State*, 622 S.W.3d 910, 914–15 (Tex. Crim. App. 2021). "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Id.*

"The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Murray*, 457 S.W.3d at 448–49). Evidence may be legally insufficient "when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320). We "cannot act as a thirteenth juror" and make our own assessment of the evidence; rather, our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

A person commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(a)(1). As charged in this case, a person commits capital murder if he "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson." *Id.* § 19.03(a)(2). "In the course of committing" means "conduct occurring in an attempt to commit, during the

commission, or in the immediate flight after the attempt or commission of the offense." *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993).

Robbery requires that a person, in the course of committing theft, and with intent to obtain or maintain control of the property, "intentionally, knowingly, or recklessly causes bodily injury to another" or "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." Tex. Penal Code § 29.02(a). To commit theft, in turn, a person must unlawfully appropriate property with intent to deprive the owner of the property. *Id.* § 31.03(a). Appropriation of property is unlawful if it is without the owner's effective consent, or the property is stolen and the actor appropriates the property knowing it was stolen by another. *Id.* § 31.03(b)(1)–(2). An accomplice witness's uncorroborated testimony is sufficient to establish a defendant's knowledge or intent for purposes of proving unlawful appropriation. *Id.* § 31.03(c)(2).

"For a murder involving a theft to constitute a capital murder committed in the course of a robbery, the intent to rob must be formulated before or at the time of the murder." *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002). "Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient." *Id.* The intent to rob may be inferred from circumstantial evidence and the actions and conduct of the defendant, including the fact that he murdered the victim. *See Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999); *Williams v. State*, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996); *Robertson*, 871 S.W.2d at 705. "Proof of a completed theft is not required to establish the underlying offense of robbery." *Maldonado*, 998 S.W.2d at 243. If there is evidence from which the jury could rationally conclude beyond a reasonable doubt that the defendant had the specific intent to obtain or maintain control of the victim's property before or during the commission of

19

the murder, then the State has proven that the murder occurred in the course of robbery. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995).

In addition to the corroborating evidence discussed above, the State presented evidence from which a rational jury could have concluded that Gatten intentionally murdered Hardin and that Gatten had formed the specific intent to obtain Hardin's property before or at the time of the murder.

Notably, in conducting our sufficiency review, we need not exclude Loy's testimony and out-of-court statements implicating Gatten. *See Stahmann*, 602 S.W.3d at 577; *see also Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("Upon being called by the defense [child] recanted the statement she had previously given. As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."); *Saldaña v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet ref'd) ("Furthermore, when a witness recants prior testimony, it is up to the fact finder to determine whether to believe the original statement or the recantation. A fact finder is fully entitled to disbelieve a witness's recantation."). Although Loy's testimony was at times inconsistent and contradictory and although Gatten and Loy each attempted to blame the other for Hardin's murder and the robbery, we resolve any contradictions or inconsistencies in favor of the jury's verdict and presume that the jury, as the sole judge of credibility, made credibility determinations consistent with that verdict. *See Stahmann*, 602 S.W.3d at 577; *Arroyo*, 559 S.W.3d at 487; *Zuniga*, 551 S.W.3d at 733; *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

For the jury to believe Loy's account would not have been irrational, as Gatten asserts. Chief Deputy Ray contrasted his interviews with Loy, who was "slightly deceptive" but eventually confessed to his involvement in Hardin's death, and Gatten, who lied repeatedly and refused to submit a DNA or handwriting sample. The jury could additionally have noted the contradiction between Gatten's account of Hardin's death during his second interview—namely, that Loy murdered him without reason—and the theories advanced by defense counsel at trial, which proposed that Hardin had engaged in autoerotic asphyxiation or that Loy had accidentally killed him during a sexual encounter involving bondage.

Loy had difficulty remembering when, where, and how many times Gatten declared an intention to rob Hardin, but other than his cross-examination, Loy maintained in both of his statements to Chief Deputy Ray as well as his testimony that Gatten had discussed robbing Hardin with Loy before Hardin's murder. Loy testified that "[Gatten] wanted to rob him" and that "Mark was ready to pull this off." He told Ray that Gatten "mentioned robbing [Hardin]" for "cash and the car." According to Loy, the "robbery plan" was for Gatten to tie up Hardin after he fell asleep and for Loy to bind Hardin's hands, which he refused to do.

The details involving the murder itself were similarly murky, but Loy was again consistent—outside of the cross-examination—that Gatten punched Hardin in the face, bound him with ligatures, and strangled him. Loy's testimony was in part corroborated by the laceration on Hardin's head and blood-splatter in the tent; there was no evidence that the injury occurred as part of a consensual sexual encounter. Loy stated that Gatten "hog-tied" Hardin and that Loy heard "choking sounds." He testified that Gatten "took Charles Hardin and held onto his neck . . . or had him in some kind of chokehold." Loy also testified that he did not strangle Hardin, that Hardin did not strangle himself, and that Gatten was the only other person in the tent. Similarly, Loy told

21

Ray that before strangling Hardin "with some rope or something," Gatten threatened to kill Hardin unless he told Gatten where his money was. Loy stated that Hardin pleaded for his life but that he was "muffled . . . for the screaming."

Dr. Chundru's testimony supported Loy's account and controverted Gatten's trial theory of a sexual encounter that "went terribly wrong." Dr. Chundru testified that Hardin could not have tied the ligatures himself, that the nature of the ligatures was inconsistent with autoerotic asphyxiation, that erotic asphyxiation involving more than one person is generally manual, that he had never seen bondage with a partner resulting in death, and that it was "pretty obvious" that someone intended to kill Hardin and that this was a "homicide or murder."

Loy testified that he and Gatten took around $20 to $35 from Hardin's wallet after the murder. Elsewhere, he testified that they took Hardin's car and money. In his first interview, Loy told Ray that Gatten "got the wallet, and there was a little bit of money in there. Might have been like twenty-three bucks. And that's when we took the car." He added that Gatten drove Hardin's car and was driving when the wreck occurred in Colorado. In Loy's second interview, he clarified that Gatten possibly found Hardin's money in the car, but Loy did not remember how Gatten obtained the money. Even were the jury to have disbelieved the evidence of Gatten's expressed desire to rob Hardin, the theft of the car immediately after the murder would alone have been sufficient for the jury to infer that Gatten murdered Hardin to facilitate the theft. *See Cooper v. State*, 67 S.W.3d 221, 223–24 (Tex. Crim. App. 2002) (stating that Court of Criminal Appeals "had held 'numerous times' that evidence is sufficient to prove murder 'in the course of' committing robbery in a capital murder case if the State proves that the robbery occurred

22

immediately after the murder" and that "[t]he general rule is still that a theft occurring immediately after an assault will support an inference that the assault was intended to facilitate the theft").[6]

Viewing the record under the applicable standard of review, we conclude that rational jurors could have found beyond a reasonable doubt that Gatten intentionally murdered Hardin in the course of committing or attempting to commit robbery. *See* Tex. Penal Code § 19.03(a)(2); *Jackson*, 443 U.S. at 319; *Stahmann*, 602 S.W.3d at 577. We overrule Gatten's second issue.

## CONCLUSION

Having overruled both of Gatten's issues, we affirm the trial court's judgment of conviction.

_____
Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed: October 30, 2025

Publish

---

[6] Gatten argues that this case is similar to *Ibanez v. State*, in which the Court of Criminal Appeals concluded that the evidence was insufficient to prove that a murder was committed to facilitate theft. *See* 749 S.W.2d 804, 807 (Tex. Crim. App. 1986). However, *Ibanez*, which did not involve an accomplice, is distinguishable. Ibanez confessed to murdering the victim out of "anger and fear" and to taking his vehicle "incidental[ly]" but stated that "*no robbery occurred*." *Id.* The Court determined that the evidence was inconsistent with the State's theory of robbery because Ibanez later abandoned the vehicle and did not take jewelry from the victim's body or vehicle. *Id.* at 808. In contrast, Gatten did not confess to murdering Hardin; there was evidence that the murder was committed to facilitate robbery; and Gatten and Loy only abandoned the vehicle after wrecking it.